**James L. HUSTON and Dayton Bait Company, Plaintiffs,**

v.

**BUCKEYE BAIT CORPORATION, Buckeye Molding Company, Inc., and William H. Robinson, Defendants.**

Civ. No. 1686.

United States District Court
S. D. Ohio, W. D.

Aug. 31, 1955.

Judgment Affirmed Oct. 22, 1956.
See 237 F.2d 920.

Clarence B. Des Jardins, Howard T. Keiser, Cincinnati, Ohio, Henry G. Dybvig, Dayton, Ohio, for plaintiffs.

Irvin V. Gleim, Dayton, Ohio, Dexter N. Shaw, Philadelphia, Pa., for defendants.

CECIL, District Judge.

The plaintiffs, James L. Huston and Dayton Bait Company, brought this action against the defendants, Buckeye Bait Corporation, Buckeye Molding Company, Inc., and William H. Robinson, by complaint filed April 8, 1953, seeking appropriate relief against the defendants on charges of infringement of two patents and unfair competition.

James L. Huston is the grantee of United States Letters Patent No. 2,231,-270 for an invention in Snap-on Corks and No. 2,415,692 for an invention in Fishing Floats. Dayton Bait Company is a corporation and a licensee of Huston for the exclusive right to manufacture fishing floats under the above described patents.

William H. Robinson is the owner of the stock of Buckeye Molding Company, a corporation, and is the owner of seventy percent of the stock of Buckeye Bait Corporation, a corporation.

The Court has jurisdiction of all of the claims by virtue of Section 1338(a) and (b) of Title 28 U.S.C.A.

By the first count of the complaint the plaintiffs charge the defendants with infringement of Claim 9 of Patent No. 2,-231,270, which will be referred to hereafter as the first Huston Patent.

Defendants, by their answer and amendment to answer, deny infringement; admit the grant of the patent to Huston February 11, 1941 and admit that the defendant Robinson controls the operations of the defendant Buckeye Molding Company.

The defendants challenge the validity of Claim 9 of the patent upon the following grounds:

(a) There was no invention for the reason that the alleged improvements of Huston had been disclosed more than two years before his application for a patent by prior patents specifically set forth

in the defendants' answer and amendment to the answer.

(b) All material and substantial part or parts of Huston's alleged improvements had been known and used in the alleged prior patents by the patentees thereof before the date of Huston's claimed invention.

(c) For more than two years before Huston's application for Letters Patent, his alleged invention had been in public use and on sale in this country.

(d) Huston was not the original or first inventor of the alleged improvements.

(e) No invention was involved.

(f) The description of the alleged invention was not sufficiently clear and concise to enable one skilled in the art to make and use it.

(g) The invention claimed to be patented by Claim 9 was not disclosed in Huston's original application.

The defendants further claim that the plaintiffs are estopped from claiming that the first Huston patent is of such scope as to embrace any float at any time manufactured, used or sold by the defendants. The defendants also claim that the complaint fails to state a cause of action against them under count one.

The Court will take up first the defendants' challenge to the validity of the patent under subdivisions (a) to (e) inclusive.

It is the claim of counsel for the plaintiffs that the "patents in suit are what are known as combination claims. In other words, the claims are not to a particular element, but to a group of elements combined in such a way that they operate in a novel manner; that is to say, the combination of elements has a new mode of operation." Plts.' br. p. 56.

In a fairly recent decision (Dec. 4, 1950) the Supreme Court of the United States discussed the subject of combination of elements as patentable inventions. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. At page 150 of 340 U.S., at page 129 of 71 S.Ct.

it is stated " * * * It is agreed that the key to patentability of a mechanical device that brings old factors into co-operation is presence or lack of invention * * *."

At page 152 of 340 U.S., at page 130 of 71 S.Ct., " * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. * * *"

Courts were admonished, at page 152 of 340 U.S., at page 130 of 71 S.Ct.

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and *improbability* of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. [Emphasis added.] * * * A patent for a combination which only unites old elements with no change in their respective functions, * * * obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

Since the parts of the combination here involved are admittedly old, the Court must look for the contribution made by their assembly. As this Court views it, it must be not only a useful or functional contribution, but it must be one that produces a new and satisfactory result.

Its use must be more than a fishing float or bobber. These have been made since time out of mind in various shapes and forms to function in such manner that when a fish gets on the fisherman's hook it pulls the bobber or float down below the surface of the water and thus advises the fisherman that he has caught a fish or at least has a bite.

Counsel for plaintiffs make such claim. They say, "the combination of elements has a new mode of operation." This "new mode of operation" is particularized in Claim 9 of the patent as follows, "the weight and the sinker acting on opposite sides of the cork to expose to view different colors on the cork when the cork

is on water and depending upon whether the sinker is supported by the cork or is resting upon the ground under the water." That is to say that when the sinker is on the bottom the weight of the spring at the top of the axis will cause the float to turn over exposing more of the red half and less of the white half of the sphere, thus notifying the fisherman that his sinker is on the bottom.

As this Court studies the briefs, the exhibits and the testimony relating to this patent, it is inescapable that the essence of the invention in Claim 9 is the turning, the new mode of operation when the weight is taken off of the clamp end of the sphere. Is this then a contribution in the way of an end result that was not taught by prior art?

Experiments performed in the court room during the trial disclosed that the float which is the subject of the Olson patent No. 1,463,020 (Def. Ex. LL) as well as others have this same mode of operation as claimed for Claim 9 of the patent in suit. The tests show that this turning movement is accelerated as the weight of the spring is increased. Other factors, none of which are described in the first Huston patent, enter into this turning operation.

If the turning movement was inherent in the Olson patent it can be said to have been taught by and included in the prior art whether claimed by Olson or not. "An inventor is entitled to all that his patent fairly covers, even though its complete capacity is not recited in the specifications and was unknown to the inventor prior to the patent issuing." 2nd Syl. Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527.

Invention cannot grow out of mere novelty of combination of elements. Such novelty cannot rise higher than the ultimate use to be derived from the assembly of elements.

Counsel for plaintiffs say in their brief, p. 65, that the Olson device is not spherical, and although made of cork, it will not have the mode of operation pointed out in Claim 9. They say there is no suggestion in it that it will turn over when the bait rests on the bottom. The Court finds to the contrary from the evidence and that it does and will turn over under such circumstances.

Is there any significance in the combination in and of itself which creates a new and useful function that was not taught by the prior art to one skilled in the art?

Counsel for plaintiff in their brief at p. 62 analyze the elements combined under Claim 9 of the first Huston patent as follows:

A body formed of a spherical piece of cork, the upper half of which is white and the lower half red;

A weight member (spring) on the spherical cork, adjacent the white half;

A clamp member (hook clamp) on the spherical cork, adjacent the red half;

The exact spring and clamp members penetrating a cork body were used in the Olson patent (Def. Ex. LL). Do the spherical shape of the cork and the red and white colors added to the spring and clamp without regard to use create a novel combination that amounts to invention?

It was pointed out in the Olson patent that various changes might be made in the form without departing from the scope of the invention. Further, it was stated therein (p. 2, Ls. 14–15) "The body 1 may of course, be made of any desirable shape."

Counsel for plaintiffs recognize that ball shaped floats are old in the art. And so they are. See Norwood and Tufts patents. (Def. Exhibits MM, NN.) Spherical floats have been manufactured and sold for many years by Ideal Fishing Float Company, Inc., of Richmond, Va., and by Balsa Company Factories, Inc., of Mobile, Alabama. (Ex. Y, Z, AA, BB, CC and DD.)

Color for attractiveness and conspicuousness was taught by the Beals and Felix patents. (Def. Ex. TT; SS.) In the Beals patent. "By using a red, black or other conspicuous color for the outer

end of the float, I make the same very conspicuous." (P. 1, Ls. 92–95.) In the Felix patent. "It is preferable to form the float of two or more colors in order to render the same more attractive. As illustrated, one portion, 10, is white while the other portion, 11, is red." (P. 1, Ls. 94–98.)

█ The Court is impelled to the conclusion that there is nothing new in the combination itself and that the elements as assembled perform no new function. The combination is without invention and the first Huston patent is therefore invalid. The patent being invalid there is no infringement by defendants.

In arriving at this conclusion, the Court has not been unmindful of Sec. 282, Title 35, U.S.C.A. "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

█ The Court also accepts as a principle of construction that where a prior patent is before the patent examiner as a reference as the Olson patent was in this case at the time he considered Huston's Claim 9, there is added force to the presumption of validity.

The file wrapper (Def. Ex. G) of the first Huston patent shows that Claim 9 was first submitted as an amended claim numbered 10. It was rejected by the examiner as new matter. Upon argument of counsel for Huston and a request for reconsideration it was accepted by the patent examiner and became Claim 9.

The argument used by counsel becomes important and is as follows:

"The references of record, Olson and Davis, do not show corks or sinkers that will indicate by their positions on the water whether the sinker is supported above ground, under the water, or resting upon the ground. Applicant's cork will definitely give the fisherman such information. *A sinker in the shape of an ordinary bottle stopper or bung can not be made to serve such purpose.* The Examiner, no doubt, has fished by using an ordinary cork bottle stopper as a float. If he has, *he knows that a float of this*

*kind will assume and maintain only one position, whether the float is on the surface of the ground, under the water, or is supported by the cork.* In the references, the cork, float, or barb, is in the shape of an ordinary bottle stopper or substantially in that shape." (Emphasis added.)

This information, particularly that italicized, is incorrect. Being incorrect, it destroys the presumption that would otherwise arise.

The second count of the complaint charges the defendants with infringement of Patent No. 2,415,692 issued to James L. Huston February 11, 1947. This patent will hereafter be referred to as the 2nd Huston patent.

The defendants by their answer and amendment to answer admit the patent was granted as alleged. The defenses to this charge of infringement except as to the references of former patents are substantially the same as those made to the first Huston patent.

Like the first Huston patent this one is based on a combination of elements. There are six claims in this patent and the plaintiffs charge that they are all infringed by the defendants.

Counsel for the plaintiffs have taken Claim 3 as typical and analyzed it into its elements on p. 88 of their brief as follows:

"3. In a float.

"(1) a pair of members forming a float body,

"(a) one of said members having a pocket therein.

"(b) both of said members having a hole therein extending from the bottom of the pocket through both members,

"(2) a coil spring having one end in the pocket

"(3) and a stem

"(a) extending from the other end of the spring through the hole,

"(4) and means on the stem cooperating with the body to hold the members together and clamp a fish line."

Counsel for plaintiffs claim that this combination of elements is new and is not shown in the prior art.

Some questions immediately suggest themselves. Does this combination produce a new and useful result? Does it produce an old result in a better, more efficient manner? If either of these questions can be answered in the affirmative, is there invention in the assembly of the elements into the combination?

In all of the cases the Court has read on the subject a combination patent must produce a new and useful result or an old result in an improved manner. In all of the brief of counsel for plaintiffs devoted to the second Huston patent there is not a word concerning the result produced by this alleged patent. Nor can the Court find that there is any use beyond that of an ordinary bobber as demonstrated by prior art. Neither does it produce known results by new and improved methods.

The assembly of elements is not novel. There is a spherical body, the same red and white colors and the same spring and clamp as were assembled in the first Huston patent. No "flash of genius" is required to determine that two semi-spherical members can be put together to make a spherical body. In support of the first Huston patent counsel for plaintiffs argue that plastic is an equivalent of cork and that defendants cannot escape infringement of the first patent by using plastic instead of cork. By the same reasoning, the use of plastic in the second patent does not create invention. The overlapping parts, the hole extending through both parts and the pocket in the white half would be obvious to any worker skilled in the art. The cap is a part of later refinement of manufacture and is not a part of the alleged combination.

Reference to the file wrapper of this patent (Ex. L) shows that the examiner in the rejection of claims for lack of invention eliminated virtually every element of this combination as being taught by prior art. It is unnecessary to go further into the application and comparison of prior patents.

The examiner finally allowed the patent with six claims. The essence of these claims is that the spring and hook on the stem of the spring passing through both members holds them together. These grants seem obviously to be based on erroneous information.

In the first place such a method of holding the members together is inconsistent with the specifications which provide, "Between the two hollow members 1 and 2 is a layer 6a of some adhesive material, which holds the two members together in a water tight condition."

In the second place the plaintiffs use an adhesive material in the manufacture of their floats so that the spring and hook could not hold them together.

In the third place when the spring is depressed and the hook released from the lower member there would be no pressure to hold the parts together.

As the claims were first written it was provided that the "members would move in relation to each other." The examiner objected to this on the basis that if adhesive material were used the members could not "move in relation to each other."

Further, of what significance are these claims to the end product involved? The Court is of the opinion that even if the spring and clamp held the halves together, the combination would be lacking in invention. Such a method of holding parts together would be obvious to one skilled in the art.

In the first Huston patent "a mode of operation" was claimed as a result of the product. Here nothing is claimed as a result in the final salable product. Of what consequence is it then how the members are held together? It neither produces a new and useful result or facilitates the production of an old result.

The Court is of the opinion that there is no invention in the combination of elements brought together here.

It has been pointed out that the plaintiff, The Dayton Bait Company, manu-

factured and sold 13,000,000 floats under these patents from 1946 to 1952 and that the plaintiff Huston received $240,000 in royalties during the same period.

■ Commercial success is not sufficient to sustain patents that are clearly invalid. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. The Court is of the opinion that both Huston patents are clearly invalid as being lacking in invention.

■ The Supreme Court of the United States has set a high standard for invention. It does not look with favor on gadgets. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, Mr. Justice Douglas in his concurring opinion stated at page 155 of 340 U.S. at page 131 of 71 S.Ct., "The Constitution never sanctioned the patenting of gadgets. Patents serve a higher end— the advancement of science. An invention need not be as startling as an atomic bomb to be patentable. But it has to be of such quality and distinction that masters of the scientific field in which it falls will recognize it as an advance."

In Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, at page 90, 62 S.Ct. 37, at page 40, 86 L.Ed. 58, the Court held that a device which made a lighter on the dash of an automobile work automatically was not invention even though " * * * the functions performed by Mead's combination were new and useful."

It was argued by counsel on behalf of the device that it had " * * * an entirely different mode of operation from any 'wireless' lighter then in existence". 314 U.S. at page 90, 62 S.Ct. at page 40.

At page 91 of 314 U.S. at page 40 of 62 S.Ct., the Court said, "The principle of the Hotchkiss case [Hotchkiss v. Greenwood, 11 How. 248, 13 L.Ed. 683] applies to the adaptation of old or well known devices for new uses. [Citations omitted.] That is to say the new device, however useful it may be, must reveal the flash of creative genius not merely the skill of the calling. If it fails, it has not established its right to a private grant on the public domain.

" * * * A new application of an old device may not be patented if the 'result claimed as new is the same in character as the original result' [citation omitted] even though the new result had not been before contemplated."

There is a third count in the complaint in which the plaintiff Dayton Bait Company charges the defendants with unfair competition. The basis of this charge is that this plaintiff adopted and used for fishing floats made and sold by it a particular dress, shape and appearance which had become recognized in the trade as identifying the Dayton Bait Company as the manufacturer of the float; that the defendants copied the features of the plaintiff's float so closely that confusion arose which caused the trade to believe that the defendants' floats were those of the plaintiff.

The defendants in their answer deny this charge and allege that the complaint does not state a cause of action.

This alleged cause of action sounds in tort and the wrong embraced within the charge is misrepresentation. Federal cases upon this subject are legion and they universally hold that the misrepresentation consists of the palming off of the goods of one manufacturer as those of another.

Misrepresentation may be open and defiant such as a deliberate sale by one person under the name of another, but in these cases it arises in a more subtle manner.

■ In the law relating to unfair competition, it is recognized that when a product acquires a "secondary meaning", that is when the particular shape, dress and appearance of a product is such that it identifies the products with the producer, an implication arises that a competing manufacturer who copies the product, subject to qualifications, is attempting to palm off his own product as that of his rival.

■ The law also recognizes that competition is the life of trade and that

the public has an interest in a free and open market. Complete copying of a product (that is without patent or trademark protection) of another is sanctioned by the law as long as the element of misrepresentation is not involved.

██ Monopolies are not encouraged. Plaintiff, Dayton Bait Company, must prove each and every essential element of its case by a preponderance of the evidence in order to establish its right to the protection claimed.

The principles of law governing the problem before the Court are not really in dispute. Many authorities are cited by counsel in their briefs in which the legal principles are developed and applied to varying states of facts.

The pertinent authorities are cited in the decision of McAllister, Circuit Judge in the case of West Point Manufacturing Co. v. Detroit Stamping Co., 6 Cir., 222 F.2d 581. This is a very well written and comprehensive opinion on the subject of unfair competition and the facts are very similar to those in the case at bar. The importance of this case is recognized by counsel and it is binding on this Court insofar as the facts are analogous. Because of this decision, the authorities cited therein and the general acceptance by counsel of the legal principles involved, the Court will indulge in little discussion of authorities.

The cases make a distinction between copying the functional parts and the non-functional parts of a product. The greater hazard is in copying the non-functional parts. This is obviously logical. The non-functional parts are likely to be for beauty, decoration and identity and thus have no relation to the use or purpose which is the thing of primary interest to the public.

There is a fourth count in the complaint which charges unfair competition by reason of breach of confidential relationship and the use of trade secrets thus obtained unfairly and unjustly. Counsel for plaintiffs in their brief have interwoven their argument on the third count with argument applicable to the fourth

count. The Court will consider each one separately as pleaded.

The question before the Court on the third count is largely one of fact. Has the plaintiff, Dayton Bait Company, established a "secondary meaning" for its product so that the particular shape, dress and appearance of the non-functional parts become identified with the producer?

██ To meet this test, it is the opinion of this Court that the appearance of the product must be fairly synonymous with the origin of the product. That is not one person but the buying public generally must come to identify the product itself through its particular appearance with the producer not necessarily by name but as a source of supply of that product.

There must be an established identity so that one looks at the product externally and says, "That is the article I want because I know the source of its production and I want the article made by that manufacturer." If the reaction is, "That is an attractive article, it looks like the kind I use or the kind I have been looking for," then it is bought for its own intrinsic value without regard to the producer. If it is the article and not the producer that is material to the purchaser, no "secondary meaning" exists.

In determining this question the Court considers that the "Buckeye" float is so similar in appearance to that of "Dayton" that they could not be distinguished by the casual purchaser without examining the names which appear on the floats in small letters.

██ The Court has examined the transcript with reference to all of the claims made by counsel for plaintiffs with respect to the existence of a "secondary meaning" of the float made by plaintiff Dayton Bait Company. Counsel for defendants say there is no evidence to support a finding of "secondary meaning." This may well be true but the Court need only go so far as to say, and it does so say, there is a want of evidence to sustain such a conclusion by a preponderance of the evidence.

Counsel for the plaintiff say that the ensemble of the Dayton float comprising the red half, the white half and the red plunger rising from the white half, with the spoked wheel design on the top of the plunger, is non-functional. (Br. p. 133.) The float is a combination of parts and as a whole it functions through its red and white halves, its hook and spring as a fishing float.

The Court considers that substantially the whole float is functional. In such case the defendants need only use reasonable care to distinguish their floats from those of Dayton. This was done by marking the name of "Buckeye" on defendants' floats with the same prominence that Dayton Bait Company marked its floats. The defendants also packed and shipped in distinctive and well-marked cartons.

The case of James Heddon's Sons v. Millsite Steel & Wire Works, Inc., 6 Cir., 128 F.2d 6, is very similar to the one at bar. At page 12 the Court said, "There is an entire absence of proof showing that appellee's bait of the design in question had been bought because the purchaser believed it originated with appellant rather than because they were useful articles with an attractive appearance. Appellee's bait having been provided with its own name plate, there seems to be no reason from the evidence in the record to suppose that confusion might arise. * * * It is to be remembered that appellee would have the right to slavishly copy the form, shape and size of appellant's bait, it being without trademark or patent protection, so long as it did not represent that the goods sold were those of the appellant. Moreover the elements of the two baits are functional to such an extent that nothing short of a showing of clear likelihood of confusion would justify a court of equity granting appellant relief."

And at page 13, "It is equally clear that so much of the shape and size of appellant's bait and markings as were old to the art and such features of it as are functional are not susceptible of exclusive appropriation by appellant, but are the common property of all mankind."

The plaintiff Dayton Bait Company has failed to prove a case of unfair competition as charged in Count 3 of the complaint.

The fourth count of the complaint to which reference has heretofore been made, charges the defendants with unfair competition based on the claim that the defendant Robinson breached a confidential relationship with the plaintiff Dayton Bait Company, whereby he obtained information and "know how" as to the manufacture of fishing floats. It is charged that the defendants unfairly and unjustly used the "know how" and "trade secrets" acquired by Robinson through his confidential relationship in the manufacture of fishing floats in competition with the plaintiff Dayton Bait Company.

The defendants in their answer deny these claims and allege no cause of action is pleaded.

The Court is of the opinion that the plaintiffs must fail on this count for the reason that no "trade secret" is established. Trade secret is more likely to be identified with process than product. Plaintiffs' claims arise first out of patents—patents on products which are made up of combinations of old elements. Certainly no trade secret was involved in the assembly of these parts. The plaintiffs' fishing floats could be bought at any sporting goods store. Anyone could disassemble them and ascertain of what they were made. When the patents were issued they contained a full description of the products with specifications showing how they could be reproduced. No evidence was offered showing that there was any trade secret involved.

Robinson's relation to plaintiff Dayton Bait Company was as a molder of parts. He did this on contract. No doubt each aided the other in solving common problems. The evidence does not show that Robinson received anything in confidence that he could not freely disclose.

In the case of Gum, Inc., v. Gumakers of America, Inc., 3 Cir., 136 F.2d 957, employees of the plaintiff left and began a competing business of their own. Although the specific question of confidential relationship was not raised, it was held that there was no unfair competition.

There is a fifth count in the complaint whereby the plaintiffs seek to recover a penalty from the defendants for marking the product of "Buckeye Bait" with the words "Pat. Pend." contrary to Section 292 of Title 35 U.S.C.A.

The applicable part of this statute is as follows "Whoever marks upon, or affixes to, or uses in advertising in connection with any article, the words 'patent applied for,' 'patent pending,' or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public—

"Shall be fined not more than $500 for every such offense."

This part of the statute did not become effective until January 1, 1953. Being a criminal statute it can not be retroactive.

At the time the statute became effective there was an application for a patent pending, to wit, Serial No. 320,-063. It seems unnecessary to go into a technical discussion of just how far the claims of this application cover the "Buckeye" float for the reason that the evidence falls short of showing that the defendants acted for the purpose of deceiving the public.

The request that the penalty be assessed is denied.

There is a sixth count in the complaint but since it is apparently abandoned it will not be discussed here.

For the reasons given herein the complaint will be dismissed as to all of its counts.

No attorneys' fees will be allowed to counsel on either side.

Counsel for the defendants will draw an order in accordance with this decision and submit it to the Court for approval.

### Findings of Fact

1. Plaintiff, James L. Huston, is a resident of Arcanum, Ohio, and plaintiff, Dayton Bait Company, is an Ohio corporation chartered on December 31, 1947, and having its principal place of business at 3307 North Dixie Drive, Dayton, Ohio. Said corporation succeeded to the business of a partnership organized in 1944, doing business under the name of Dayton Bait Company, and composed of Walter Shiverdecker, James Shiverdecker and Harry L. Holloway.

2. Defendant, William H. Robinson, is a resident of Miamisburg, Ohio, and, from about December, 1946, to October 29, 1952, carried on business as a molder of plastic parts under the name Buckeye Molding Company. Defendant, Buckeye Molding Company, is an Ohio corporation chartered on October 29, 1952, having its principal place of business at Miamisburg, Ohio, and it succeeded to the business formerly carried on by defendant, William H. Robinson, under the same name. Defendant, Buckeye Bait Corporation, is an Ohio corporation chartered on August 15, 1952, and having its principal place of business at Miamisburg, Ohio. Defendant, William H. Robinson, owns the corporate stock of the Buckeye Molding Company, and controls the operations thereof, and owns 70 percent of the capital stock of Buckeye Bait Corporation, and controls the operations thereof.

3. All parties are within the Western Division of the Southern District of Ohio.

4. United States Letters Patent, No. 2,231,270, for Snap-On Cork were issued to the plaintiff, James L. Huston, on February 11, 1941, on his application filed May 19, 1939.

5. United States Letters Patent, No. 2,415,692 for Fishing Float were issued to the plaintiff, James L. Huston, on February 11, 1947, on his application filed May 17, 1944.

6. The Court has jurisdiction of the claims for patent infringement under 28 U.S.Code, § 1338(a) and of the claims for unfair competition under 28 U.S. Code, § 1338(b).

7. Plaintiff, James L. Huston, is the owner of U. S. Letters Patent, No. 2,231,270 for Snap-On Cork and No. 2,415,692 for Fishing Float. During the years 1940, 1941 and 1942 James L. Huston manufactured and sold fishing floats constructed in the manner described in his patent, No. 2,231,270 under the business name of Combination Float Company. The first floats made by Huston were constructed from a cork ball, but balsa wood was substituted for cork in the later floats made by him.

8. Plaintiff, Dayton Bait Company, a partnership, was licensed by James L. Huston, as exclusive licensee to manufacture and sell fishing floats of the Huston design; the first license agreement was executed on March 30, 1944, and Dayton Bait Company produced its first floats which were made of plastic, as described in the second Huston patent, in December, 1944. The license provided for a royalty to Huston of 8 percent of sales. The exclusive license was renewed with Dayton Bait Company after its incorporation.

9. The file wrapper of the first Huston patent, No. 2,231,270 (Defendants' Exhibit G), is incorporated herein and made a part of this finding by reference. Claim 9 is the only claim of this patent which is charged to be infringed. This claim reads as follows:

"In a float for a fishing line, a body formed of a spherical piece of cork, one part of said cork being colored in one color and an opposite part of said cork being colored in another color, a weight member on said cork adjacent one color and a clamp member on said cork adjacent the other color to engage a fishing line having a sinker thereon, the weight and the sinker acting on opposite sides of the cork to expose to view different colors on the cork when the cork is on water and depending upon whether the sinker is supported by the cork or is resting upon the ground under the water."

10. In support of this claim counsel for Huston submitted the following argument:

"The references of record, Olson and Davis, do not show corks or sinkers that will indicate by their positions on the water whether the sinker is supported above the ground under the water or is resting upon the ground. Applicant's cork will definitely give the fisherman such information. A sinker in the shape of an ordinary bottlestopper or bung cannot be made to serve such purposes. The Examiner no doubt has fished by using an ordinary cork bottle stopper as a float. If he has, he knows that a float of this kind will assume and maintain only one position, whether the float (sinker) is on the surface of the ground under the water or is supported by the cork. In the references the cork, float, or bob is in the shape of an ordinary bottle stopper or substantially in that shape."

11. A cork of the shape of an ordinary bottle stopper when combined with a spring as in Olson can be made to assume more than one position depending upon whether or not the sinker is resting upon the ground underneath the water or is being supported by the float, indicating to the fisherman accordingly; hence the argument quoted in Finding No. 10 is incorrect.

12. Floats constructed in accordance with the first Huston patent, No. 2,231,270 may not turn at all, may turn only an imperceptible amount, may turn slightly, or may turn appreciably, depending on various factors, particularly on the weight of the spring. Any turning from 1 degree to 180 degrees is a "turning" or "turning over" within the meaning of patent No. 2,231,270 and claim 9 thereof. A turning of a few degrees is not perceptible when the float is used in fishing, particularly in rough water.

13. The Olson patent, No. 1,463,020, issued in 1921 (Defendants' Exhibit LL), discloses the same snap-on spring as is disclosed in patent No. 2,231,270 referred to as the first Huston patent. The snap-on springs of both patents are constructed and function in the same way. The Olson patent discloses that cork, among other buoyant materials, may be used as the float body. While the float shown in the drawings of the Olson patent is frusto-conical, that is, in the form of an ordinary bottle stopper, the Olson patent not only states that various changes may be made in the form and the like of the float parts without departing from the scope of the invention but specifically points out that "the body may, of course, be made of any desirable shape." The Olson patent, as offered in evidence, is incorporated herein by reference and made a part of this finding.

14. Spherical or ball shaped floats are old in the art. Such floats are shown in the Norwood patent, No. 241,150 of 1881, and the Tufts patent, No. 418,995 of 1890. These patents are Defendants' Exhibit MM and NN, respectively and are incorporated herein by reference and made a part of this finding. The Ideal Fishing Float Co., Inc. of Richmond, Virginia, has manufactured and sold spherical floats since at least 1923 and the Balsa Company Factories, Inc. of Mobile, Alabama, has manufactured spherical floats since at least 1938.

15. Ball shaped floats being old and common in the art, such shape was a "desirable shape" within the disclosure of the Olson patent, No. 1,463,020 and the use of the snap-on spring in a spherical float body was, therefore, taught by the Olson patent.

16. A fishing float comprising a snap-on spring and a spherical float body as taught by Olson patent No. 1,463,020 functions in the same way as the float claimed in claim 9 of patent No. 2,231,-270.

17. No advance in the art could reside in painting any float, including the float of the Olson patent No. 1,463,020, in contrasting colors. Floats so painted are disclosed in the Beals patent No. 1,065,-204 of 1913 and the Felix patent No. 1,-589,522 of 1926. These patents are Defendants' Exhibits TT and SS, respectively, and are incorporated herein by reference and made a part of this finding. Floats, one portion of which is painted white and the other portion of which is painted red, are old in the art, and spherical floats so painted have been sold by the Ideal Fishing Float Company, Inc., of Richmond, Virginia, since at least 1923, and by the Balsa Company Factories, Inc., of Mobile, Alabama, since April, 1939. (Defendants' Exhibits Y, Z, AA, BB, CC and DD.)

18. The turning or alleged new mode of operation of claim 9 of patent No. 2,-231,270 is anticipated by the disclosure of the Olson patent No. 1,463,020.

19. No invention can be found in substituting, for the bottle stopper float body shown in the drawings of the Olson patent, the spherical float body long known in the art. In such a substitution or combination, the snap-on spring and the spherical float body each performs the same function which it performed in the prior art.

20. Referring to the specific embodiment shown in the drawings of the Olson patent No. 1,463,020 where the snap-on spring is carried by a bottle stopper, the floats offered in evidence and which were constructed in accordance with the drawings of the Olson patent turned approximately 75 degrees and approximately 90 degrees, depending upon the weight of the spring and the size of sinker. (Defendants' Exhibits OO and PP respectively.) Such turning provides a clear visual indication to the fisherman when the sinker has reached the bottom. These floats constructed in accordance with the drawings of the Olson patent turned appreciably more than a number of the floats which plaintiffs asserted were constructed in accordance with patent No. 2,231,270.

21. Floats of claim 9 of patent No. 2,-231,270 show no new mode of operation as compared to a float in which the snap-on spring is carried by a bottle stopper.

22. No disclosure of any "turning" characteristic of the float was contained in the application which matured into patent No. 2,231,270 when that application was originally filed in the Patent Office. The statements made in the specification of patent No. 2,231,270 from page 1, column 2, line 51, and page 2, column 1, line 17, in claim 9, were amendments to the application after it was filed.

23. There are several factors which must be correlated in a float of the type disclosed in patent No. 2,231,270 to provide a float that will turn to any particular extent or degree. None of these factors are disclosed in patent No. 2,231,270.

24. The fact that claim 9 of patent No. 2,231,270 was allowed by the Patent Office upon erroneous representation of counsel for the applicant set forth in finding No. 10, destroys the prima facie validity of that claim.

25. Plaintiffs have enjoyed a measurable degree of commercial success. Dayton Bait Company has paid royalties to Huston in excess of $240,000 during the existence of the license agreements. During the seven-year period from 1946 to 1952, Dayton Bait Company sold more than 13,000,000 fishing floats for an amount in excess of $1,750,000. Commercial success, however great, cannot raise claim 9 of patent No. 2,231,270 to the level of invention in view of the prior art.

26. Claim 9 of patent No. 2,231,270 is lacking in invention and is invalid over the disclosure of the Olson patent No. 1,-463,020 and over the disclosure of said Olson patent in the light of the structures and processes well known to and practiced by the art.

27. Patent No. 2,415,692 relates to a fishing float in which the snap-on spring of patent No. 2,231,270 (or of the Olson patent No. 1,463,020) is carried by two hollow, semi-spherical members held together, according to the claims of the patent, by the snap-on spring.

28. All of the claims of patent No. 2,-415,692 are charged to have been infringed. Each of the claims of the patent requires that the float shall be so constructed that the two semi-spherical members shall be held together by the snap-on spring.

29. The claims of patent No. 2,415,-692 are directed to a float that is sold and used and not to a float in the process of manufacture or to a method of production. Reference is hereby made to the file wrapper (Defendants' Exhibit L) which is incorporated herein by reference and made a part of this finding.

30. The floats of the Dayton Bait Company are formed of two hollow, plastic, semi-spherical members. Between the two hollow members is a layer of some adhesive material, which holds the two members together in a watertight condition. Such floats, although they had been sold by Dayton Bait Company for several years, were not marked with number of patent No. 2,415,692 until after the suit was filed.

31. The Examiner at first rejected the claims of patent No. 2,415,692 and later allowed them only upon the insistence of the applicant that the snap-on spring functioned to hold the two hollow semispherical members together. The applicant pointed out that this function was not possessed by the snap-on spring when such spring was used with the solid cork body of patent No. 2,231,270.

32. During the prosecution of the application which issued as patent No. 2,-415,692 the applicant sought to obtain a claim directed to substantially the same subject matter as claims 5 and 6 of the patent but without the limitation that the float be so constructed that the snap-on spring shall serve to hold the two semispherical members together. Such claim was refused by the Patent Office on the ground that it was not patentable over the prior art and the applicant acquiesced in this holding and cancelled the claim.

33. The float bodies of the defendants' floats charged to infringe the claims of patent No. 2,415,692 are formed of two plastic semi-spherical members welded together by a weld that is stronger than the plastic material itself and are not so constructed that the snap-on spring

functions in any way to hold the two plastic semi-spherical members together.

34. The plaintiffs' product, that is, the fishing float produced by the combination of elements described by patent No. 2,415,692, performs no new function over fishing floats produced by prior art. Neither is an old result accomplished by new and improved means. The combination is lacking in invention.

35. Floats formed of two hollow semi-spherical members are old in the art. The Norwood patent No. 241,150 of 1881 and the Tufts patent No. 418,995 of 1890 (Defendants' Exhibits MM and NN respectively) both disclose such floats and in the floats of these patents, a member extends internally of the float between the float halves.

36. The Plano Molding Company, of Plano, Illinois, made molds for plastic fishing floats in June, 1942. The molds were ordered by Sears, Roebuck & Company; sample floats were molded and shipped in 1942 to Sears, Roebuck & Company and to the Ideal Fishing Float Company, Inc., of Richmond, Virginia. These fishing floats were formed of two plastic semi-spherical members welded together and with internal projections provided with a hole extending between the float halves. They were painted, for the most part, red and white. The floats did not have a spring or hook but did have a plastic plug, wedge shaped, which was inserted in the hole holding the float to the fishing line at any desired position. Dayton Bait Company floats resemble these earlier floats except for the missing spring and hook on the Plano floats. There was no commercial production of the Plano floats on any scale due to lack of materials until after the end of World War II; Sears, Roebuck & Company featured the Plano floats in their 1946 catalog but not before.

37. Since October 29, 1952, and prior to the filing of the complaint herein, defendants have made and sold, without license from plaintiffs, plastic fishing floats such as are illustrated and described in Plaintiffs' Exhibit 7, known as the Buckeye float, and plastic fishing floats such as are illustrated and described in Plaintiffs' Exhibit 8, known as the Heddon float. Both the Buckeye float and the Heddon float resemble the float of Dayton Bait Company, illustrated in Plaintiffs' Exhibit 3, with minor variations therein.

38. The fishing floats made and sold by plaintiff, Dayton Bait Company, from November, 1948, to date, as exemplified by Plaintiffs' Exhibit 3 and the defendants' Buckeye and Heddon floats (Plaintiffs' Exhibits 7 and 8) embody a buoyant sphere made up of two plastic hemispherical members cemented together to form a watertight cavity with a central passage therethrough and having a spring seated in a pocket in one of the hemispherical members which communicates with the central passage. A stem having a hook on its lower end for clamping the line passes through the central passage and is embedded by molding in the center plug of the plastic plunger cap which covers the exposed end of the spring and is slidable in the pocket.

39. Many years before the floats of the Dayton Bait Company were placed on the market, red and white ball-shaped floats with a red member rising from the white half of the float and having for all practical purposes the shape, dress and appearance of the floats of the Dayton Bait Company, had become standard articles of commerce. Such floats had been sold by Ideal Fishing Float Company, Inc., of Richmond, Virginia, since at least 1923, and by Balsa Company Factories, of Mobile, Alabama, since at least April, 1939.

40. The ensemble of the red and white ball-shaped float with the red plunger rising from the white half of the float is functional. Such ensemble affects the purpose, action and performance of the floats and facilitates their use.

41. Dealers in fishing supplies have, at times, ordered from their jobber or wholesaler Dayton Bait Company floats and received either Dayton Bait Company, Buckeye Bait Corporation or Heddon floats. Retail purchasers, however, did not and do not know the difference

nor do they care who the manufacturer is so long as they obtain a float having the features desired. The source of supply has no bearing on the choice of float among the retail customers.

42. Dayton Bait Company failed to establish that there was any feature or combination of features in its floats that had acquired a secondary meaning identifying the source of the floats, either at the time Buckeye Bait Corporation entered into the field in October, 1952, or at the present time, and more specifically, Dayton Bait Company failed to establish that the ensemble of a red and white ball-shaped float with a red plunger rising from the white half of the float had acquired a secondary meaning identifying the source of the floats either at the time Buckeye Bait Corporation entered the field in October, 1952, or at the present time.

43. The floats sold by Buckeye Bait Corporation have been marked with the seller's name and address: "Buckeye Bait Corp., Miamisburg, Ohio" or "Heddon, Dowagiac", (as the case may be) molded in the red portion of the floats. The marking of the seller's name and address on the floats sold by Dayton Bait Company, marked "Dayton Bait Co., Dayton, Ohio," is of the same size and is located in the same position on the float as is the name and address on the floats sold by Buckeye Bait Corporation.

44. The floats marked with the name "Buckeye Bait Corp., Miamisburg, Ohio" and "Heddon, Dowagiac" are sold by Buckeye Bait Corporation and James Heddon's Sons Company, Inc., in display boxes marked distinctly different from the display boxes of Dayton Bait Company. (Plaintiffs' Exhibits 20, 41 and Defendants' Exhibits ZZ.)

45. Defendants have not committed any act or acts of unfair competition against Dayton Bait Company in the manufacture or sale of fishing floats by reason of any shape, dress or appearance of said floats.

46. The defendant, William H. Robinson, learned nothing of a confidential nature from the Dayton Bait Company.

No precautions were taken by Dayton Bait Company to maintain in secrecy any of the details relating to the manufacture of the fishing floats. There was no trade secret involved in the manufacture of the fishing floats by Dayton Bait Company. The first Huston patent, No. 2,231,270 was a matter of public record from the date of its issuance on February 11, 1941; the second Huston patent, No. 2,415,692 from the date of its issuance on February 11, 1947.

47. Information was disclosed to William H. Robinson by the Dayton Bait Company regarding the molding of plastic parts, the various problems involved, and the necessary information and specifications for production of the plastic parts, but Mr. Robinson was never cautioned to retain such information in confidence. Mr. Robinson supplied molded parts to the Dayton Bait Company on oral contract between the parties from May 20, 1948, to November 29, 1951. No confidential relationship was created or existed between William H. Robinson and Dayton Bait Company.

48. Defendants have not committed any act of unfair competition against Dayton Bait Company in the manufacture and sale of fishing floats by reason of the breach of any confidential relationship.

49. William H. Robinson made application for a patent on a fishing float, Serial No. 113,059, on August 30, 1949, (Plaintiffs' Exhibit 19). This application became abandoned on July 6, 1950. A petition to revive this application was filed on July 21, 1952, but was denied by the Patent Office on August 25, 1952. Robinson made a second application for a patent on a fishing float, Serial No. 320,063, on November 12, 1952, which is still pending. (Plaintiffs' Exhibit 18.)

50. The application of William H. Robinson, Serial No. 320,063 at the present time contains, and has contained since the application was filed on November 12, 1952, one or more claims that cover the float manufactured and sold by Buckeye Bait Corporation.

51. The plaintiffs failed to prove that William H. Robinson intended to deceive the public by marking defendants' floats with the notation "Pat. Pend."

52. Defendants have not violated Section 292, Title 35, U.S.C.A., by reason of the marking of its floats with the notation "Pat. Pend."

## Conclusions of Law

1. A patent is presumed to be valid and the burden of establishing invalidity rests on the party asserting it. The presumption of invention created by the grant of a patent prevails until it is rebutted or overcome by evidence. This presumption has greatly increased weight when the references principally relied upon were those considered and found wanting in the Patent Office.

2. Commercial success and commercial recognition of the patented improvements are factors entitled to consideration in determining whether such improvements amounted to invention.

3. Combinations of elements are patentable, even though the elements individually may be old, provided the combination has a new mode of operation according to which it functions.

4. The contention of the plaintiffs that a float made in accordance with claim 9 of patent No. 2,231,270 has a new mode of operation according to which it functions being rebutted and overcome by evidence showing that it does not have a new mode of operation over floats constructed by prior art and that the combination of elements assembled under said patent performs no new use or purpose over floats constructed under prior art, claim 9 of patent No. 2,231,270 is lacking in invention and therefore invalid.

5. The evidence in support of lack of invention is sufficiently strong to rebut and overcome the presumption of validity arising out of the granting of the patent and to rebut and overcome the increased weight of the presumption by reason of the Olson patent, No. 1,463,020 (Defendants' Ex. LL) having been a reference before the Patent Office in the consideration of patent No. 2,231,270.

6. There is no function, use or purpose resulting from the assembly of elements constituting the combination patented under claim 9 of No. 2,231,270 that was not anticipated or taught by prior art.

7. United States Letters Patent of Huston, No. 2,231,270, are invalid as to claim 9 thereof and have not been infringed by defendants by the manufacture and sale of the Buckeye and Heddon floats.

8. No new result being accomplished or no old result being accomplished in a new and improved way by the assembly of parts constituting the combination patented under the six claims of No. 2,-415,692 the said patent and each of the claims thereof, are lacking in invention and therefore invalid.

9. There is no function, purpose or use resulting from the assembly of elements constituting the combination patented under the six claims of patent No. 2,415,692 that was not obvious to one skilled in the art or that was not anticipated or taught by prior art.

10. United States Letters Patent of Huston, No. 2,415,692, are invalid as to each of the six claims thereof and said patent has not been infringed by defendants by the manufacture and sale of the Buckeye and Heddon floats.

11. There is no misrepresentation by reason of the similarity of the floats of the plaintiff, Dayton Bait Company, and those of the defendant, Buckeye Bait Company, in the particular shape, dress and appearance of the non-functional parts, whereby the defendant, Buckeye Bait Company, attempts to palm off its floats as those of the plaintiff, Dayton Bait Company.

12. The defendant, Buckeye Bait Company, has taken reasonable precaution to mark its floats and those of the Heddon Company with the names of Buckeye and Heddon and to ship them in distinctive cartons so as to avoid confusion with the floats of Dayton Bait Company.

13. The defendants are not guilty of unfair competition by reason of facts alleged in the third count of the complaint.

14. The defendants are not guilty of unfair competition by reason of any confidential relationship whereby the defendant Robinson acquired any trade secrets and "know how" from the Dayton Bait Company which he used or disclosed unfairly and unjustly.

15. The law, Section 292 of 35 U.S. C.A., effective January 1, 1953, provides a fine or penalty for anyone who marks upon any article any word importing that a patent application is pending when none is pending for the purpose of deceiving the public.

16. This law is not retroactive from the date it became effective. There being a patent application pending at the time the law became effective which had claims for a fishing float concerning the kind made by Buckeye Bait Company and the evidence failing to establish that the marking was for the purpose of deceiving the public, the defendants or either of them are not subject to the penalty of Section 292 of Title 35, U.S.C.A.