**BALDWIN–LIMA–HAMILTON CORPO-RATION and Edward E. Simmons, Jr., Plaintiffs,**

v.

**TATNALL MEASURING SYSTEMS COMPANY and The Budd Company, Defendants.**

Civ. A. No. 23505.

United States District Court
E. D. Pennsylvania.

Dec. 1, 1958.

Reargument Denied Dec. 26, 1958.

See also 22 F.R.D. 12.

1

Arthur Littleton and Robert C. McAdoo (of Morgan, Lewis & Bockius), Philadelphia, Pa., Walter J. Blenko, Sr., and Walter J. Blenko, Jr. (of Blenko, Hoopes, Leonard & Buell), Pittsburgh, Pa., for plaintiffs.

Edward A. Hathaway, Waltham, Mass., for plaintiff Baldwin-Lima-Hamilton Corp.

Joseph W. Swain, Jr., and Thomas N. O'Neill, Jr. (of Montgomery, McCracken, Walker & Rhoads), Philadelphia, Pa., Dexter N. Shaw and John C. Dorfman (of Howson & Howson), Philadelphia, Pa., for defendants.

**6**

STEEL, District Judge.

Simmons, a patentee, and his licensee, Baldwin-Lima-Hamilton Corporation (hereinafter "Baldwin") have sued The Budd Company (hereinafter "Budd") and its wholly owned subsidiary, Tatnall Measuring Systems Company (hereinafter "Tatnall"), for infringement of Claims 1, 2, 3, 4, 5, 7, 8 and 9 of Patent No. 2,292,549 (hereinafter "Simmons patent"). The patent relates to a gage for measuring strain in materials.

Baldwin has marketed "bonded wire strain gages" under the Simmons patent since 1940. Without license from plaintiffs, Tatnall has manufactured, used and sold "foil type" strain gages and Budd has used "foil type" strain gages manufactured by Tatnall. The "foil gages", plaintiffs charge, infringe the Simmons patent.

In defense the defendants have pleaded (a) noninfringement; (b) invalidity because of (i) anticipation, (ii) lack of invention and obviousness, (iii) inadequacy of patent description, and (iv) inclusion of new matter in amendment to application; and. (c) unclean hands because of (i) fraud on the Patent Office, and (ii) patent misuse.

Jurisdiction exists under 28 U.S.C. § 1338(a).

### Subject Matter of Simmons Patent

The load or force which is applied to a body is known as "stress". It may be expressed in terms of pounds per square inch. When a body is subjected to stress, it is deformed to some extent. The deformation is known as "strain". It may be expressed in terms of inches of strain per inch of length.

In any material used for engineering purposes, the stress must be kept within safe limits to prevent failure. Well-known and determinable relationships exist between stress and strain in engineering materials. Where the strain in a material is known at a given point, the stress at that point can be ascertained.

The purpose of the Simmons gage is to measure strain. The gage employs the principle discovered by Lord Kelvin more than a century ago that the electrical resistance of materials which are electrically conductive varies with the strain thereof. If the material is stretched, its resistance will increase; if it is compressed, its resistance will decrease. This property is referred to in the Simmons patent as "electrical strain sensitivity".

Claim 5 contains three elements: (i) a test body whose strain is to be measured, (ii) a continuous metallic filament of solid electrical conducting material whose electrical resistance varies in accordance with changes in strain in the filament, and (iii) a means for adhesively bonding the filament in an untaut condition throughout its effective length to the body to be tested so that the filament forms a completely unitary part of the test body [1]. When a filament described by Simmons is bonded to a test body as Simmons has directed, any deformation of the test body will cause a corresponding deformation in the filament (for instance, a lengthening of the test body will cause a commensurate lengthening of the filament) and the electrical resistance of the filament will vary as deformation changes occur. By an appropriate electrical circuit (not subject to the Simmons patent) the variance in the

---

1. Claim 5 reads:
 "An electrical strain gauge for measuring changes in the deformation of a test body as it is variably strained, comprising a continuous and untaut metallic filament of solid electrical conducting material whose electrical resistance varies in accordance with changes in strain in the filament, and means for adhesively bonding said filament in its untaut condition throughout its effective length to said body so that said filament forms a completely unitary part of said body and is held thereto by adherence fully transmitting to said filament changes in the deformation of said body and correspondingly varying the electrical resistance of said filament."
 The parties agree that it is typical of all claims and that the determination of its validity will be dispositive of the validity of the patent in its entirety. Transcript of Argument, October 10, 1958, at p. 102.

electrical resistance of the filament can be recorded. By comparing such resistance changes with the predetermined electrical strain sensitivity of the filament, the strain in the test body can be ascertained.

### Infringement

35 U.S.C. § 271(a) defines infringement as the unauthorized making, using or selling of a "patented invention". The critical question, therefore, is what the Simmons patented invention is, and whether the foil gages manufactured by Tatnall embody it.

The sketches below have been agreed upon by counsel as magnified versions of the Baldwin gage (wire type) and the Tatnall gage:

### Baldwin Gage (Wire Type) Tatnall Gage

In the Simmons bonded wire gage the electrical current flows from one end of the wire to the other, and the entire length of the wire, wound back and forth, is the gage. In the foil gage of defendants the current flows from one lead connection tab through the first straight length of foil, then across the enlarged connecting portion of foil, then down through the next straight length of foil, then across the next enlarged connecting portion of foil, and so on, to the other lead connection tab. As in the Simmons gage, the foil gage is bonded to the specimen to be tested, thereby becoming a

slave, as it were, of the test body, and deforming precisely as the test body deforms. With the occurrence of deformations in the foil measurable variations take place in the electrical resistance of the foil. The Simmons wire strain gage operates on this same principle.

Defendants contend that the invention of Simmons is limited to a "filament" in the form of a wire, that the foil of defendants' gage is neither a wire nor a filament, and that therefore the foil gage does not embody Simmons' invention. Plaintiffs assert that Simmons did not limit his invention to a filament which was a wire but intended filament to have a connotation sufficiently broad to comprehend the foil conducting elements of the defendants' gage.

 Claim 5 is not in words restricted to a filament in the form of a wire. But the claims of a patent need not be read in a vacuum. For purposes of determining whether an accused device is an infringement, the claims of a patent are to be interpreted not only in the light of the specification but also with reference to the file wrapper history. Mas v. Owens-Illinois Glass Co., D.C.D.N.J. 1954, 122 F.Supp. 582, 583; affirmed, 3 Cir., 1955, 222 F.2d 889; certiorari denied 350 U.S. 1016, 76 S.Ct. 661, 100 L. Ed. 875; rehearing denied, 1946, 351 U.S. 943, 76 S.Ct. 838, 100 L.Ed. 1470. Here, both the specifications and the representations which Simmons made to the Patent Office during the patent prosecution establish that the filament which Simmons claimed as an element of his invention was a filament in the form of a wire.

Thus, Simmons says in his specification, "To determine the strain * * * I employ my improved strain sensitive electrical means consisting of a filament of very fine metallic wire"[2]. At other places in the specification the word "filament" is used in conjunction with "wire"; as for example, "wire filament"[3] and "wire forming a filament"[4].

2. P–68, page 2, col. 1, lines 9–11.

3. P–68, page 2, col. 1, lines 31, 37, 39; p. 3, col. 2, lines 6, 30.

4. P–68, page 3, col. 1, line 28.

The file wrapper discloses that Simmons used the words "wire filament" at least thirteen times and the word "wire" no less than thirty-eight times. Nowhere did Simmons define the word "filament" in any other way. At one point Simmons said, " * * * applicant's filament is a continuously solid metallic wire element * * * "[5]. In distinguishing the Lorig patent which the Patent Office had cited as an anticipation, Simmons pointed out that Lorig had no thought of using "a strain sensitive filament formed of a continuously solid metallic wire * * * "[6], thereby inferentially indicating that the Simmons patent did call for a "metallic wire".

That Simmons limited his electrical strain sensitive element to "fine metallic wire" is conclusively settled by the affidavit which Simmons filed in the Patent Office on August 19, 1941. There Simmons described his "invention" as follows:

"A continuously solid fine metallic wire was bonded throughout its effective length to a member subject to strain and this wire was connected to an electrical circuit whereby a change of strain in the wire was accompanied by a predetermined change of electrical resistance of the wire. The change in electrical resistance was measured by the electrical circuit, thereby indicating the amount of strain."[7]

If "filament" in the Simmons patent is construed to mean wire, then the foil elements of defendants' gages are outside the literal terms of the claims. And even though filament is given some latitude of meaning beyond that of wire, still in its primary sense, it means "a thread or a slender, thread-like object * * * ". Webster's New International Unabridged Dictionary.

Dimensionally the foil elements of defendants' gage are completely lacking in the "thread-like" characteristic of a filament. In defendants' 130–1 gage, the thickness of the foil is approximately .000150 inches and the width of straight lengths is .0096 inches, giving a ratio of width to thickness of approximately 64 to 1. In defendants' 141 gage, the thickness of the foil is the same and the width is .0062, giving a ratio of width to thickness of approximately 41 to 1. The foil elements can be more accurately described as ribbons or strips than filaments.

■■ Accordingly, defendants have not been guilty of a literal infringement of Simmons' patent. In spite of this fact, a comparison of defendants' foil gage with plaintiffs' wire gage discloses that the distinctions between the two are colorable only. Uncontroverted testimony by plaintiffs' expert, Dr. Ruge, as well as a courtroom demonstration which stands unassailed, establish that the two devices do the same work in substantially the same way and accomplish the same result. The devices in the eyes of the law are therefore the same under the doctrine of equivalents which had its origin in Winans v. Denmead, 1854, 15 How. (56 U.S.) 329, 330, 342–343, 14 L.Ed. 717 more than a century ago. The fact that the two gages may be different in form or shape is not important. Nor is it significant whether the Simmons invention is primary or secondary in character. Even a patentee of a secondary invention consisting of a combination of old ingredients which will produce a new and useful result is entitled to claim the benefits of the equivalency doctrine since its essence is the prevention of a fraud on a patent. Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 607–608, 70 S.Ct. 854, 94 L.Ed. 1097.

In Haskell Golf Ball Co. v. Perfect Golf Ball Co., D.C.S.D.N.Y. 1906, 143 F. 128 it was held that under the doctrine of equivalents a golf ball made of a thin and highly elastic "rubber band" infringed a golf ball patent which claimed as an element a "rubber thread"

5. D–54, page 44.
6. D–54, page 72.

7. D–54, page 58.

winding, because the band "serves every purpose of the thread" and "is its equivalent in every respect. It answers the same purpose and performs the same function." At page 131. These words might well have been written with respect to the foil element of defendants' gage in its relationship to the filament of the Simmons patent.

Defendants assert that the foil gage has definite advantages over the Simmons gage in that the enlarged connecting portions in the foil gage between the straight lengths have a width several times greater than the width of each straight length, and this gives the gage a greater bonding area and reduces the adverse effect of the sections transverse to the applied strain. So far as the record reveals, in the Simmons gage neither the bonding nor the transverse sections of the wire created a problem which required solution. In any event, an infringement cannot be avoided by making an improvement on the particular form of a patented device even where, unlike the situation at bar, a patent has issued on the so-called improvement. Temco Electric Motor Company v. Apco Mfg. Co., 1928, 275 U.S. 319, 328, 48 S.Ct. 170, 72 L.Ed. 298; Otto Coking Co., Inc., v. Koppers Co., 3 Cir., 1919, 258 F. 122, 135; Balaban v. Polyfoto Corp., D.C.Del., 47 F.Supp. 472, 480.

In determining whether an accused device constitutes an infringement a court must first look into the art to find what the real merit of the alleged invention is and whether it has advanced the art substantially. If it has done so, then a court should be liberal in construing the patent and in finding infringements in the use of equivalents to the end that the inventor may secure the reward which he deserves. Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523. This principle is apposite. The record establishes overwhelmingly that the merit of the Simmons gage was so compelling that, once it was accepted, it virtually supplanted all types of prior art gages.

It is clear, therefore, that Tatnall has infringed the Simmons patent by making, using and selling foil gages which embody the Simmons invention, and that Budd has infringed the Simmons patent by using foil gages which it has purchased from Tatnall.

## Validity

### (a) Anticipation

Defendants contend that a paper published by St. Lindeck in Germany in 1908 constitutes an anticipation of Simmons which renders his patent invalid. 35 U.S.C. §§ 102, 282. St. Lindeck was a scientist with Physikalish-Technische Reichsanstalt (hereinafter "Reichsanstalt"), an organization corresponding to the United States Bureau of Standards. In 1908 he wrote an article, "On the Influence of Air Humidity on Electric Resistances". This was written because of two earlier papers by Rosa and Dorsey and by Rosa and Babcock, employees in the United States Bureau of Standards. The Rosa and Dorsey paper, according to St. Lindeck, indicated that Rosa and Dorsey had checked the "resistances of Wolff's resistance boxes" which were an assemblage of highly precise wire coils and connections manufactured by Otto Wolff of Berlin for use as comparison resistors in electrical measurements. According to St. Lindeck, Rosa and Dorsey had found that the resistances at equal temperatures during the summer had higher values than in the winter and that the increase in the spring and the decrease in the fall took place very gradually. This phenomenon was the subject of later study by Rosa and Babcock whose conclusions were thus summarized by St. Lindeck:

"It was found that the *hygroscopicity* of the *shellac* that was used in the manufacture of the resistances was the cause of the phenomenon. As is known, the wire which is insulated with silk in the resistances of the Reichsanstalt is wound on a metal tube; for obtaining a good insulation, the tube was originally coated with a shellac solution only,

before winding the wire; later it was thought advisable, on account of the above mentioned reason, *bekleben* [to adhere] a piece of shellacked silk fabric on the *spule* [spool]. After winding on the wire, the whole *spule* [coil] is again lacquered and is then dried for a considerable time, about 10 hours at 140° C. for the purpose of aging.

"According to Rosa and Babcock, the periodic changes of resistance are so explained that with increasing relative air-humidity the shellac, particularly the lacquer lying *between* the wire and metal tube swells; the diameter of the base on which the wire was wound increases and the resistance wire is stretched elastically on account of the forces produced thereby, so that the resistance is increased; with decreasing humidity the shellac, on its part, gives off moisture and shrinks; the pressure on the wire is decreased and the resistance is again reduced. Because during the entire year the relative humidity is lowest in winter, particularly in heated rooms, while in summer approximately the high atmospheric humidity prevails in laboratories, the phenomenon is perfectly understandable. * * *" (Emphasis by St. Lindeck.)[8]

Thereafter the St. Lindeck paper states that upon the suggestion of a Mr. Warburg he (St. Lindeck) "confirmed by direct experiment" the explanation given by Rosa and Babcock of the effect of humidity changes upon resistance. St. Lindeck described his experiments as follows:

"* * * The correctness of the above given explanation was, upon a suggestion of Mr. Warburg, confirmed by a direct experiment. A resistance Spule [coil] was so arranged that by means of a pressure pump a pressure up to 60 atmospheres could be exerted from the inside on the brass tube and thereby on the wire winding; it was apparent that the resistance changes were exactly proportional to the pressure and that the wire followed the changes in diameter of the tube with perfect elasticity. With a wall thickness of the brass tube of 0.5 mm. (with 2 cm. diameter) a pressure change of one atmosphere produced a resistance change of 7 x $10^{-6}$. *Perhaps a method for measuring high pressure may be based hereon.*" (Emphasis by St. Lindeck.)

The St. Lindeck article, considered in its entirety, defendants argue, teaches one skilled in the art how to make and use a bonded wire strain gage. It is to be noted, however, that the experiment, as described by St. Lindeck, does not say that the wire was bonded or adhered to the brass tube around which it was wrapped. On the contrary, St. Lindeck's description of the experiment at least suggests that the wire was not bonded. St. Lindeck says that pressure was exerted "from the inside on the brass tube and thereby on the wire winding; * *". Read literally, St. Lindeck is saying that the pressure imparted internally to the brass tube was transmitted by the brass tube *directly* to the wire winding. St. Lindeck does not mention shellac (the bonding means which defendants say that St. Lindeck used) as an intervening agency of transmission. This omission is especially significant because when St. Lindeck referred to the work of Rosa and Babcock he pointed to their conclusion that the diameter of the base on which the wire was wound changed because of the swelling of the *"lacquer"* and the shrinking of the *"shellac"*. Yet, in describing his own experiment St. Lindeck simply stated that the air pres-

8. This is an agreed upon translation except that the meaning of the words "bekleben" and "spule" were not the subject of agreement. The parenthetic English words after the German words were the interpretations placed on the words in the context of their use by Roberts, defendants' expert. At the trial their meanings were not disputed.

sure was exerted "from the inside of the brass tube and *thereby* on the wire winding" without any reference to the presence of "lacquer" or "shellac".

Notwithstanding this affirmative evidence that the wires were not bonded to the tube in St. Lindeck's experiment, defendants assert that the fact that the wires were bonded appears from other parts of the St. Lindeck paper. This is based upon the assumption that St. Lindeck performed his experiment on a coil taken from a "Wolff resistance box" (or "Wolff box") and that the wires on these coils were bonded to the brass tube by the use of shellac in accordance with the manufacturing techniques of the Reichstanstalt described by St. Lindeck (supra, 169 F.Supp. at page 9). Although the evidence substantiates that the wires of the "Wolff resistance box" were bonded to the brass tube, the record is far from clear that St. Lindeck in fact used a coil from a Wolff box. Defendants' assertion to the contrary is not based upon what St. Lindeck said, but is drawn from inferences which they and their expert, Mr. Roberts, derive from the description of the St. Lindeck experiment and from other parts of his paper.

Thus, defendants point out that St. Lindeck shows that the investigation of Rosa and Babcock was concerned with coils from a Wolff box which had a diameter of two centimeters, that St. Lindeck used a two-centimeter coil in his experiment, that St. Lindeck conducted a "direct experiment" to confirm the Rosa and Babcock explanation of the humidity resistance phenomenon, and that St. Lindeck found in his experiment that the resistance changes were exactly proportional to the pressure and that the wire followed the changes in diameter of the tube with perfect elasticity. From these facts defendants assert that the conclusion is certain that St. Lindeck's experiment involved the use of a coil from a Wolff box.

Defendants attribute unwarranted significance to the statement that St. Lindeck corroborated the Rosa and Babcock observation by "direct experiment". This does not necessarily mean that Lindeck used a coil from a Wolff box simply because Rosa and Babcock did. St. Lindeck was not interested in studying a Wolff coil to see whether shellac in its absorption of moisture caused the diameter of the coil to increase. Had this been his objective, it would have been necessary to subject a Wolff coil to humidity variations (either actual or simulated) and then to have measured the changes in diameter of the coil to see whether he could correlate the diameter changes with the humidity changes. What St. Lindeck set out to do was to determine whether, if a change in the diameter of the coil had been occasioned by the absorption of moisture by the shellac as Rosa and Babcock had postulated, such a change in the diameter would produce changes in the electrical resistance of the magnitude indicated by Rosa and Babcock. The utilization of a Wolff box coil was not needed for this purpose. By introducing pressure into any tube, St. Lindeck could measure the varying changes of resistance occasioned by the expansion of the tube.

Moreover, the tube used in a Wolff box coil was open at each end. If St. Lindeck had desired to experiment on a Wolff box coil, it would have been necessary to modify the coil by sealing off one end with sufficient firmness to withstand the pressure of several hundred pounds occasioned by the pressure of 60 atmospheres and by attaching to the other end a pressure mechanism of some kind. Furthermore, the fitting which was brazed into one end of the tube used in the Wolff box coil for purposes of attaching it to the Wolff box would probably have had to be removed. In the view of Dr. Ruge, at least, these modifications would have almost certainly destroyed the precision of the coil.[9]

---

9. Mr. Roberts, defendants' expert, said "There might be several ways of closing the end of the tube. It could be done with a cap." On the other hand, Dr. Ruge testified:

Defendants point out that St. Lindeck in describing his experiment said that "the resistant changes were exactly proportional to the pressure and that the wire followed the changes in diameter of the tube with perfect elasticity". Upon the basis of the testimony of Mr. Roberts, defendants' expert, it is argued that if the wire had not been bonded to the tube, the tube and the wire would not have acted as a unit, there would have been minor movements between the tube and the wire, and the wire would not have acted with perfect elasticity. On the other hand, Dr. Ruge, plaintiffs' expert, testified that since in the resistance applications with which St. Lindeck was working the wire was not stretched beyond its elastic limit [10], the elastic properties of the wire would compel the wire to follow changes in circumference of the tube upon its expansion and contraction regardless of whether the wire was bonded. This view is substantiated by Rundell Patent No. 2,663,781 which deals with electrical pressure gages employing strain-responsive wire elements. The patent recognizes that when wire is wound onto a hollow cylindrical body into which fluid pressure is introduced, the wire winding will react to changes in diameter of the cylindrical body with resultant variations in the electrical resistance of the wire, and that the imposition of tension in the winding of the wire "eliminates the necessity for bonding the filament throughout its effective length to the surface on which it is wound". While the patent does not say that the wire reacts to pressure changes with perfect elasticity, this must have been substantially so, for otherwise the utility of the device as a pressure gage would be impaired.

Defendants argue that the presumption of validity of the Simmons patent is not operative against the Lindeck publication, since St. Lindeck was not cited against Simmons in the Patent Office. Conceding that this is so, I am unable to find within the four corners of St. Lindeck that he conducted his experiment with the coils from a Wolff resistance box; and if he did not, the premise that he used a bonded wire vanishes. The conclusion that St. Lindeck did use coils from a Wolff resistance box rests at best upon inferences, deductions, and explanations of plaintiffs' expert. All of these I find inconclusive as against the affirmative evidence in the St. Lindeck paper that Wolff box coils were not used by St. Lindeck in his experiment, that for practical reasons it is unlikely that St. Lindeck would have attempted to modify a Wolff coil to the extent necessary for his experiment, and that the use of the coil from a Wolff resistance box was not needed to obtain the confirmatory data which St. Lindeck was seeking. In any event, inferences as distinct from disclosures cannot be accepted as a basis for anticipation. Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 1929, 31 F.2d 427, 431. While Skelly deals with an anticipating patent, the law of anticipation is the same regardless of whether a prior patent or publication is relied upon. Willamette-Hyster Co. v. Pacific Car & Foundry Co., 9 Cir., 1941, 122 F. 2d 492, 497; Midland Flour Milling Co. v. Bobbitt, 8 Cir., 1934, 70 F.2d 416, 417.

The fact that St. Lindeck was inadequate to teach persons skilled in the

"The tube is so thin, as one may readily see, that even if one were able to perform the amazing feat of holding this in a lathe and cutting out the fitting, one could never thread it and put a screwed fitting and the problem of meeting those pressures would be serious. So I just feel that it would be very illogical to infer that this was done and logical to infer, certainly, on the basis of my many years of laboratory and shop experience, that it was done otherwise."

10. Elastic limit is defined in Book of ASTM Standards, Including Tentative Standards, Part I, Metals, 1939 as follows:

"Elastic limit—the greatest stress which a material is capable of developing without a permanent deformation remaining upon complete release of the stress."

art how to make and use a bonded wire strain gage, is substantiated by the fact that although the article was published in Germany in 1908 no bonded resistance type strain gages had been developed in Germany prior to the end of the Second World War. With the multitude of demonstrated advantages of the bonded gages it is not likely that the Germans, under the pressure of wartime demand for strain measurement, would have failed to develop bonded gages if St. Lindeck taught how they could be made and used.

Defendants likewise cite as an anticipation an article by P. H. Dike in Review of Scientific Instruments, Vol. 7, July 1936, pp. 278–287. This article relates generally to an investigation conducted on the effect of humidity on resistance elements by reason of its effect on the insulation covering the wires of such elements. In this investigation Dike made a number of experiments. These showed, among other things, that coils wound with silk-covered wire increased in resistance with increased humidity, that coils wound with cotton or linen decreased in resistance with increase in humidity, that coils with no textile covering did not change in resistance with change in humidity, and that strands of silk and of cotton or linen unwound from the wire increased and decreased in length, respectively, with changes in humidity. Dike then proceeded to explain the changes of resistance with humidity variations as follows:

"With a silk covering a decrease in humidity causes a shortening and tightening of the covering. The spiral wrapping thus exerts an additional pressure on the wire, and at the same time, a longitudinal force, tending to shorten it and thus decrease its resistance, while an increase in resistance produces the contrary effect. With linen or cotton covered wire, which, as stated above decreases in length with increase in humidity, the effect should be just the opposite to that of silk, as has been observed." [11]

Immediately thereafter Dike added:

"It should be noted that, in order to make these changes in length of the covering material react upon the wire, it must adhere to the wire sufficiently to resist a longitudinal sliding of the insulation along the wire. If the wire with its covering is impregnated with shellac or other varnish the adherence between the wire and covering becomes stronger and the humidity effects on the resistance are somewhat increased, as is confirmed by our observations."

Upon the basis of these observations, and particularly the latter one, defendants assert that Dike taught that when a strain sensitive wire is bonded to a test body changes in strain of the test body are transmitted to the wire through the bonding medium with resulting changes in the resistance of the wire corresponding to the changes in the strains encountered by the test body. In the Dike article the test body, according to defendants, is the textile insulation around the wire.

I fail to find any suggestion by Dike that strain may be measured by the use of bonded wire or otherwise. Dike's interest was in the elimination of strain which occurred in the textile wrappings by virtue of the action of humidity thereon. The detection of this strain did not rest upon any observed variations in electrical resistance. On the contrary, it resulted from Dike's observation of changes in length of the textile wrappings after the wrapping had been *unwound.*[12]

---

11. Having concluded that in their reaction to humidity silk and cotton had precisely opposite properties (under the same conditions, one lengthened and the other shortened), Dike says that this naturally suggested that their use in combination, in properly proportioned

amounts, might eliminate the variations of resistance with humidity. Tests which Dike ran confirmed this fact.

12. At p. 285 of DX–73, first col., last par., Dike says:

Nor can one glean from what Dike says that bonding is taught in any sense comparable to Simmons. Dike says that in order to make the changes in the length of the covering material react upon the wire, it must adhere to the wire "sufficiently" to resist a longitudinal sliding along the wire. This means that if the forces generated by changes in length of the wire wrapping as a result of humidification are to be imparted to the wire there must be some amount of adhesion of the wrapping to the wire. When Dike states that if the wire and covering are impregnated with shellac the adherence between the wire and covering becomes stronger and the humidity effects on the resistance are "somewhat increased", he obviously means only that the shellac augments, in a matter of degree, the effect of the unshellacked winding. This statement falls far short of teaching what Simmons taught, namely to measure strain the wire should be bonded throughout its effective length to the test specimen so that the wire forms a completely unitary part of the specimen.

But even if Dike can be read as stating that alterations in the resistance of the wire are to be explained by dimensional changes in the wrapping which are communicated to the wire because the wire and the wrapping constitute a unitary part of each other, still Dike does not anticipate Simmons. Dike's observations related to the precision resistor art. Simmons' discovery pertains to the strain gage art. The two are not analogous.

■■■■■ Attempts to distort and magnify prior non-analogous art by way of anticipation have been condemned by the Courts. Alemite Mfg. Corporation v. Rogers Products Co., 3 Cir., 1930, 42 F.2d 648, 651. To ascertain whether two

arts are analogous, heed must be given not merely to their physical differences but particularly to the differences in their problems and the means and methods of solving them. Radiator Specialty Co. v. Buhot, 3 Cir., 1930, 39 F.2d 373, 374; Wallace v. Mandel Bros., Inc., 7 Cir., 1947, 164 F.2d 861, 864.[13] So tested it is plain that the precision resistor art with which Dike was concerned is not sufficiently related to the strain resistor art dealt with by Simmons to charge Simmons with knowledge of the Dike article. For Simmons to have applied the disclosures of Dike to advance the strain gage art in the manner which he did would in itself have been an inventive act. Compare General Electric Co. v. Hoskins Mfg. Co., 7 Cir., 1915, 224 F. 464, 467, 470; Yablick v. Protecto Safety Appliance Corp., 3 Cir., 1927, 21 F.2d 885; Akme Flue, Inc., v. Aluminite Flexible Flue Cap Co., 2 Cir., 1928, 27 F.2d 736.

Dike was associated during his lifetime with Leeds & Northrop Company, an outstanding manufacturer of precision measuring instruments. Significantly, it never evolved a strain gage based upon Dike's work. Presumably it was unable to discern in the Dike article what plaintiffs say it so clearly discloses.

*(b) Lack of Invention—Obviousness*

■■■■■ Unquestionably Simmons' bonded strain gage was new and useful. But to render a device patentable the additional element of invention is required. Thompson v. Boisselier, 1885, 114 U.S. 1, 11, 5 S.Ct. 1042, 29 L.Ed. 76; Cuno Engineering Corporation v. Automatic Devices Corp., 1941, 314 U.S. 84, 90, 62 S.Ct. 37, 86 L.Ed. 58. Invention cannot exist unless the subject matter of the patent discloses more ingenuity and skill than that possessed by an ordinary mechanic. Hotchkiss v. Greenwood,

"A strand of the silk covering, unwrapped from a wire, was supported in a vertical tube and stretched by a small weight. When exposed to a change of relative humidity from 5 to 100 percent, it increased in length by about 1 percent. A strand of the cotton or the linen wire

covering, tested in the same way, decreased in length by about 0.2 percent."

13. Reversed on other grounds in Mandel Bros., Inc., v. Wallace, 1948, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12.

1850, 11 How. (52 U.S.) 248, 267, 13 L. Ed. 683; Sinclair & Carroll Co. v. Interchemical Corp., 1944, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644.

Invoking this principle, defendants assert that since the prior art disclosed a bonded carbon strain gage and an unbonded wire gage, all that Simmons did was to take the obvious step of substituting wire for carbon and his patent is therefore invalid under 35 U.S.C. § 103.

 Simmons, who was participating as a graduate student in the Cal. Tech. Impact Research Project, was fully aware of the bonded carbon gages, and, since the Carlson unbonded wire gage was patented on April 7, 1936 and articles discussing the principle of that gage had been published by Eaton in 1931 and by Carlson in 1935, Simmons was chargeable with knowledge of the Carlson principle. Zephyr American Corporation v. Bates Mfg. Co., 3 Cir., 1942, 128 F.2d 380, 385. Defendants argue that the advantages of flexibility, relative stability and freedom from hysteresis and moisture and temperature effects, and capability for mass calibration, which are claimed by Simmons as advantages over the bonded carbon gages, are properties inherent in wire. Anyone with ordinary skill in the art, defendants say, would have recognized that the shortcomings of the bonded carbon gages and the unbonded wire gages could be overcome, and the advantages of each could be retained, by substituting the bonding of wire for the bonding of carbon since the properties of wire and the advantages of bonding were known. This argument, persuasive though it be, must be considered in the light of the experience of others who were attempting to solve the strain measurement problem. The argument cannot withstand this test.

For years the safety of propellers was a matter of the utmost concern to the aeronautical industry. As early as 1916 when propellers were constructed entirely of wood, vibratory stresses had been the primary cause of propeller failures. With the advent of metal propellers in 1936 the problem became even more critical. Realizing that propeller failures could be explained and avoided only by locating the causes of the vibrations and determining the amount of stress which the propeller assemblies could withstand, about 1930 Hamilton-Standard, a division of United Aircraft Corporation, embarked on an exhaustive program of research on vibratory stresses as they affected propellers. Efforts were concentrated on developing devices by which vibratory strains could be measured both in the shop and in flight, for it was realized that in the absence of quantitative assessment of the strains, prediction of safety was largely a matter of intuition.

Hamilton-Standard tried many types of strain measuring devices. Prior to the summer of 1936 it had experimented with an optical method, a "scratch" gage, an electro-magnetic system, and a piezoelectric system. Practical difficulties were encountered with all of these. Efforts were then focused on finding some sort of a resistance gage. In the spring of 1936 the Aquadag method suggested by Hull of General Electric was tried and abandoned. This involved the painting of colloidal graphite (carbon) electrically sensitive to strain to a member to be strained and passing an electric current through the strip. Thereby the variation in the strain of the specimen which was transformed to the colloidal graphite could be determined by the variance in the recorded electrical resistance of the colloidal graphite. Beginning in the summer of 1936, Hamilton-Standard tried successively a number of different types of bonded carbon resistance gages all of which utilized as the resistance element carbon sticks which were bonded to the test specimen. Over 22,000 of these gages were manufactured and used with a fair degree of success. Primarily because of the difficulty of shaping the sticks to conform to curved surfaces, a flexible type of bonded carbon strain gage was developed which supplanted the stick gages. In late 1942 Hamilton-Standard began to work with the bonded wire gages, and after a short period of transition the cost and techni-

cal advantage of the wire gages were so pronounced that the carbon gages were permanently abandoned and the Simmons bonded wire gages were used exclusively.

The magnitude of the Hamilton-Standard vibratory project is indicated by the fact that by 1940 over 500,000 separate measurements had been made and forty-five persons were employed on a full-time basis to study the problem. These included a number of well-qualified engineers and scientists of whom Kearns, one of defendants' witnesses, was one. Although a young man at the time, he received the Sperry Award of the Institute of Aeronautical Sciences for the work which he did in 1939 in applying methods of measuring propeller vibration stresses in flight. For further work in the same field he was similarly honored in 1942 by the Franklin Institute which awarded him the Longstreth Medal. By 1940 Hamilton-Standard had engaged three of the outstanding experts to consult with it on the fundamental principles involved in its vibration studies. These were Dr. DeForest of M.I.T., who, with Dr. Ruge, was employed by Baldwin in 1940 to make gages for it under the Simmons patent; Dr. Den Hartog, an internationally recognized authority on vibration; and Dr. Bollay, an associate professor in the mechanical engineering department at Harvard.

■ The Hamilton-Standard experience is compelling proof that the Simmons invention was not obvious. Hamilton-Standard is a division of a great corporation. Its top scientists and consultants were not tyros. Its interest in obtaining the best type of measurement device was not a matter of academic concern. Lives and dollars depended upon its ability to develop and use the best possible devices for measuring propeller strains. Yet, so far as the record discloses, the possibilities of making a bonded wire strain gage never occurred to Hamilton-Standard prior to Simmons'

discovery. Even after the Simmons gage became commercially available its potentialities were not sufficiently evident for Hamilton-Standard to immediately use the gages. In fact, it took it several years to be persuaded of its worth. This in itself is persuasive proof that what Simmons did was not obvious or the utilization of mere mechanical skill. McKee v. Graton & Knight Co., 4 Cir., 1937, 87 F.2d 262, 264; National Battery Co. v. Richardson Co., 6 Cir., 1933, 63 F.2d 289, 292.

The possibilities of measuring strain through its relationship to electrical resistance of carbon bonded to a test specimen had been studied by other outstanding people. A. Bloch of the Physics Department of Trinity College, Dublin, and E. H. Hull of General Electric Research Laboratory had written articles on the bonded carbon gages in 1935 and 1937, respectively. Apparently neither thought of substituting wire for carbon. Moreover, bonded carbon gages were studied by a group at Cal. Tech., including Simmons, in connection with the comprehensive examination of the strain measurement problem in the Impact Research Project conducted at Cal. Tech. Of the group there involved only Simmons thought of using a bonded wire.

Although no evidence exists that Hull, Bloch or indeed Hamilton-Standard knew of the Carlson unbonded wire gage, still if the advantages of the substitution were as plain as defendants say, it is odd that the possibility of the substitution did not occur to any of them.

■ Defendants point out that the idea of a bonded metallic strain gage occurred to Dr. Hathaway of General Electric [14] and to Dr. Ruge at about the same time as it did to Simmons and offer this as evidence of obviousness. Neither Hathaway nor Ruge were men of ordinary skill in the art as 35 U.S.C. § 103 requires that they be for their discovery to be pertinent to the defense of obviousness. Each had scientific graduate degrees and were highly skilled inventors.

14. Not to be confused with Hathaway who was Baldwin's house patent counsel.

Dr. Hathaway has had 53 patents issued to him, and Dr. Ruge is credited with 43 more. The fact that the substitution of wire for carbon in a bonded gage occurred to Drs. Hathaway and Ruge is therefore not significant.

Again it is said that the obviousness of what Simmons did is established by the fact that his gage was forthcoming just as soon as the need for it in dynamic testing arose for the first time in the mid-1930's. The legal predicate for this contention is sound enough. Safety Car Heating & Lighting Co. v. General Electric Co., 2 Cir., 1946, 155 F.2d 937, 939; McElrath v. Industrial Rayon Corp., 4 Cir., 1941, 123 F.2d 627, 629. But the need for a strain gage having the merit of Simmons' existed in the field of dynamic testing long before Simmons' discovery although undoubtedly the need was constantly accentuated by the increasing use of automobiles and airplanes.

From the fact that the electrical output of carbon is 100 times greater than metallic wire, defendants argue that at the time when Hamilton-Standard was carrying on its work, recording devices had not been developed which would give the amplification needed to record the relatively weak response provided by a wire gage. Although Kearns of Hamilton-Standard testified that between 1936 and 1940 big strides had been made in obtaining resistance recordation by means of amplification, the record fails to indicate that Hamilton-Standard considered using a bonded wire gage but rejected the idea because of lack of instrumentation. The instrumentation problem did not prevent either Simmons or Ruge from recognizing the practical advantages of the bonded wire gage over prior art gages and from seeking patents thereon.

 Now that the Simmons gage has been acclaimed, it is easy to say that what he did was obvious. But the law

has other tests of invention than subtle conjectures of what might have been seen and yet was not. Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 434–435, 31 S.Ct. 444, 55 L.Ed. 527. The practiced eye of an ordinary mechanic may be safely trusted to see what ought to be apparent to everyone. Potts v. Creager, 1895, 155 U.S. 597, 608, 15 S.Ct. 194, 39 L.Ed. 275. Prior to and after Simmons' discovery scientists and technicians of pre-eminence had been devoting their attention specifically to strain measurement by variations in electrical resistance over a long period of time. Their failure to discover what Simmons hit upon demonstrates that it was not obvious. I would indeed be bold were I, untutored in technical and scientific matters, to conclude that any ordinary mechanic skilled in the electrical strain gage art could have done what Simmons did, when in fact outstanding scientists working with the problem over a period of years failed to do it.

It is argued that the Simmons combination patent merely unites old and well-known elements—bonding and wire—without producing any new or different function or operation of a surprising or extraordinary kind and hence it is devoid of the requisites of patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152–153, 71 S.Ct. 127, 95 L.Ed. 162; Packwood v. Briggs & Stratton Corp., 3 Cir., 1952, 195 F.2d 971, 973; certiorari denied 344 U.S. 844, 73 S.Ct. 61, 97 L.Ed. 657; rehearing denied 344 U.S. 882, 73 S.Ct. 174, 97 L.Ed. 683; Mojonnier Bros. Co. v. Tolan Machinery Co., Inc., 3 Cir., 1956, 230 F.2d 850, 851; Fowler v. Honorbilt Products, 3 Cir., 1942, 131 F.2d 153, 155. While these principles evolved in the field of mechanical patents, it may be assumed that they apply with equal force to an electro-mechanical patent such as Simmons' [15].

---

15. Compare Great Atlantic & Pacific Tea Co., supra, 340 U.S. at page 152, 71 S.Ct. at page 130.

"Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usu-

From the evidence I am satisfied that the bonding of the wire did result in a new and different function or operation for the wire as against its unbonded use by Carlson. The wire in the Carlson gage was useless to measure compression strains; it would function only to measure tension strains. Furthermore, once the wire in the Carlson gage had been stretched beyond its elastic limit in measuring tension, the gage was ruined.[16] These limitations inherent in the wire of the Carlson gage were eliminated by Simmons by bonding the wire to the test specimens. A new and different function or operation for the wire was achieved. The wire did not serve as separately it had done for Carlson. Cf. Toledo Pressed Steel Co. v. Standard Parts, Inc., 1939, 307 U.S. 350, 356, 59 S.Ct. 897, 83 L.Ed. 1334. Nor did the bonding do to carbon in the carbon gage what it did to wire in the Simmons gage. It couldn't. Carbon is not ductile and therefore does not have elastic limit characteristics or present elastic limit problems. The contrary is true of wire which is ductile. The elements—bonding and wire—were so united by Simmons as to produce a new and useful result because of their co-action as a single entity. Griscom-Russell Co. v. Westinghouse Electric & Mfg. Co., 3 Cir., 1941, 121 F.2d 680, 682. The whole did in fact exceed the sum of its parts. Great Atlantic & Pacific Tea Co., supra, 340 U.S. at page 152, 71 S.Ct. at page 130. The ability of the wire in the Simmons gage to be stressed appreciably beyond its normal elastic limit and still faithfully maintain its predetermined strain sensitivity was a surprising result. Even Simmons didn't recognize the inherency of that phenomenon in his invention until his lawyer Hathaway, who had learned of it through Dr. Ruge, called it to Simmons' attention. The Simmons patent therefore does not suffer the infirmity of an unpatentable aggregation of old and well-known elements. Instead, it fully meets the test of the relevant decisions.

### (c) Inadequacy of Description

Preliminary to discussing this defense it is necessary to explain certain technical terms, the meaning of which must be understood, if the defense is to be comprehendible.

Electrical strain sensitivity is the property which electrical conductive materials possess which causes their resistance to electrical current to change with any change in their strain. In measuring strain by means of variation in resistance the change in resistance as it relates to change in strain is frequently plotted on a graph with one axis indicating resistance changes and the other indicating strain changes. When this is done a strain-resistance "curve" is obtained. When the change in resistance is proportional to the change in strain at all degrees of strain, the strain-resistance curve will be substantially a straight line. Then it is said to be a "linear" curve and that "linearity" exists in the resistance-strain relationship.

The "elastic limit" of a material is the greatest stress which a material is capable of developing without a permanent deformation remaining upon complete release of stress. When a stress is applied to a material, it is strained thereby. When a stress below the elastic limit of a material is applied, it will strain the material, but the material will return to its original dimensions on release of the stress. Where, however, a stress above the elastic limit of the material is applied, the material will not return to its original dimensions, but will remain permanently deformed.

The gist of the "inadequacy of description" defense is that Simmons asserted in his specifications that the electrical strain sensitivity of any bonded wire is linear both above and below the elastic limit of the wire, that in point of fact this is not true as to *all* wires, and that

---

al result of uniting elements old in mechanics."

16. See footnote 10, supra, 169 F.Supp. at page 12.

because the patent fails to teach one skilled in the art which of many wires must be used to obtain linearity the specificity required by 35 U.S.C. § 112 has not been satisfied. Under this section of the patent law no patent can be validly obtained unless the specification contains a written description of the invention, and of the manner of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the invention.

Undoubtedly *some* wires have strain-resistance characteristics which are not linear either below or above the elastic limits of the wire. This was conceded by Dr. Ruge, plaintiffs' expert. It was likewise established by defendants' demonstrations with wires made of nickel and Secon No. 1, respectively. Hence, the validity of the "inadequacy of description" argument comes down to this: does the patent in fact teach that any wire bonded to a test specimen in accordance with Simmons' teaching will exhibit a linear strain-resistance relationship both above and below the elastic limit of the wire when the specimen is subjected to variable strains?

Plaintiffs rely upon three statements in the patent which they say assert a linear strain-resistance characteristic for any wire. The first is:

"A still further object is to provide an improved electrical strain sensitive apparatus that has a substantial linear calibration curve * * *".

Here Simmons is declaring linearity to be an objective of his gage. This objective can be achieved by the use of Constantan wire. Defendants concede this. Simmons' preferred embodiment of his invention called for the use of Constantan [17].

But even though linearity of calibration cannot be accomplished with all types of wire, linearity of calibration was only one of Simmons' objectives. The patent discloses that Simmons had other important objectives. The first one which the patent recites is:

"To provide an improved electrical strain sensitive gage that has a high degree of sensitivity, accuracy and responsiveness adapted to produce a maximum constancy of calibration in order to assure reproducible results and thereby minimize various defects arising from atmospheric influence as well as such defects as zero shifting and hysteresis."

This objective was substantially accomplished by Simmons' gage.

The next objective stated in the Simmons patent is:

"A further object is to provide improved electrical strain sensitive means that has a high natural frequency whereby a uniform response is obtained to a given force, independent of the velocity of the application of the force within the limits of the working range."

Here again this objective was accomplished by the Simmons gage.

The failure of a patent to accomplish all of its stated objectives will not defeat the patent if some of its objectives are accomplished by its teaching. Scovill Mfg. Co. v. Satler, D.C. Conn.1927, 21 F.2d 630; Kirchberger v. American Acetylene Burner Co., D.C.N D.N.Y.1903, 124 F. 764; affirmed, 2 Cir. 1904, 128 F. 599; Eames v. Cook, C.C. Mass.1860, Fed.Cas.No.4,239. This is a complete legal answer to plaintiffs' contention that the inability of all wires to give a substantial linear calibration curve, which was one of Simmons' stated objectives, renders the patent invalid.

To establish that Simmons was claiming linearity for all types of strain gage

---

17. The patent says:
 "This wire may be a suitable and well-known material such as 'Constantan' * * *".

Later it says:
 "Constantan has proved to be a very desirable material for filaments."

wires, plaintiffs next point to the statement in the patent which is italicized:

"Except in extreme forms, the filament sensitivity is not affected by the geometry of the winding. *In all forms the per cent change in resistance per unit elongation is practically constant. * * *"*

When the italicized words are read in context it is obvious that Simmons is simply saying that the percentage change in resistance per unit elongation will not be affected by any variation in the geometry of the winding of the wire. The statement is not a representation of any kind with respect to the result to be expected when different types of wires are used.

The last statement in the patent which plaintiffs point to to establish that the linearity was claimed for all types of wire reads:

"A phenomenon inherent in my improved combination of a fine wire filament bonded throughout its effective length to a test specimen or body to be variably strained is that the filament may be stressed appreciably beyond its normal elastic limit or yield point and still faithfully maintain its predetermined strain sensitivity, this phenomenon occurring even during repetitive loading."

This says nothing about linearity. It refers only to the faithful maintenance of the predetermined strain sensitivity of the wire even when the wire is stressed appreciably beyond its normal elastic limit. The patent defines what Simmons meant by electrical strain sensitivity. He says that it is the principle that the electrical resistance of materials varies with the strain thereof. This variation in relationship may or may not be linear. Simmons therefore does not say that his bonded strain gage will result in linearity regardless of what wire is used in the gage.

Furthermore, Simmons' purpose "to produce a [gage with] maximum constancy of calibration in order to assure reproducible results" (supra, 169 F. Supp. at page 19) shows that he was not interested solely in accomplishing a substantially linear calibration as plaintiffs argue. Simmons' interest was in achieving "constancy" of calibration whether linear or non-linear.

Other portions of the patent support the view that although Simmons recognized the desirability of linearity, he did not assert it to be the crux of his patent. Simmons says that his strain gage employs "broadly" the principle of electrical strain sensitivity; that the strain sensitivity of various materials may be obtained from standard tables "or readily determined by experiment"; that the calibration of a strain sensitive filament may be affected by progressively loading in a materials testing machine and "observing the corresponding variations in electrical resistance of the strain sensitive filament"; that the principles that govern the action of the filament allow "accurate reproducible results to be obtained"; and that the filament may be repeatedly stressed beyond its normal elastic limit "while the filament retains its said predetermined manner of resistance change." These statements are consistent with a teaching that the bonding of the wire will insure reproducible results. They contain nothing to suggest that such reproducible results were restricted to responses which were linear. On the contrary, the generality of the expressions which Simmons used is inconsistent with a claim that any wire may be depended upon to give a linear response either above or below its elastic limit.

Gages susceptible of linear calibration have a decided advantage over other gages since by advance calibration the user may be given a number or "gage factor" by which the resistance change value may be multiplied in order to arrive at the strain value. Baldwin, in all of its gages listed in its price list, uses a wire which has the advantage of a linear relationship within the recommended working range, and the package containing each of these gages discloses

its "gage factor". However, Baldwin itself has sold gages which do not have a linear response. These had to be calibrated from a graph or chart containing a non-linear curve instead of from a "gage factor" in the form of a number. A linear response therefore is not essential to the successful operation of a gage constructed in accordance with Simmons' teaching.

Defendants' "inadequacy of description" argument rests upon the premise that the patent asserts that a linear strain-resistance relationship will obtain with any type of wire both below and above its elastic limit.[18] The fact is the patent makes no such claim.

#### (d) New Matter in Amendment to Application

Defendants assert that the patent is invalid because "new matter" not inherent in the original application was added to the patent in violation of 35 U.S.C. § 132. The "new matter", defendants say, was the reference in an amendment to a "phenomenon" of Simmons' invention, viz., the ability of the filament to be stressed appreciably beyond its normal elastic limit and still faithfully maintain its predetermined strain sensitivity during repetitive loading. The action of the Patent Office in permitting the amendment constituted an implicit determination that no "new matter" was included in it. Defendants' arguments fail to convince me that the action of the Patent Office was clearly erroneous. Under the circumstances, I am not disposed to take a position at variance with its action. Cf. Helms Products, Inc., v. Lake Shore Mfg. Co., 7 Cir., 1955, 227 F.2d 677, 679.

### Unclean Hands

#### (a) Fraud in the Patent Office

This defense is based upon defendants' assertion that plaintiffs knowingly made false statements to the Patent Office which induced it to grant the Simmons patent following its earlier rejection. In essence, defendants charge that plaintiffs perpetrated a fraud on the Patent Office. If this is true, the patent is unenforceable. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381. There it was held that the doctrine of unclean hands barred a plaintiff from enforcing a patent against an infringer when the Patent Office had issued the patent upon the basis of perjured testimony and suppression of facts which plaintiff had reason to know about. If, however, the proof fails to establish with "any reasonable degree of certainty that there has been a deliberate misrepresentation" in the Patent Office, the defense of unclean hands cannot be successfully asserted. Helene Curtis Industries v. Sales Affiliates, D.C.S.D.N.Y.1954, 121 F.Supp. 490; affirmed 2 Cir., 1956, 233 F.2d 148; certiorari denied, 1956, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 [19].

Specifically defendants contend that plaintiffs knowingly represented to the Patent Office, contrary to the fact, that *any* wire used in accordance with Simmons' teaching would *always* produce a linear relationship between variations in strain and change in resistance and that but for such representation the patent would not have issued. Plaintiffs concede that all wires do not give a linear strain-resistance response. A definition

18. Defendants have not contended that constant reproducible results, either linear or non-linear, are not obtainable either below or above the elastic range with all types of wire. I have not, therefore, examined either the evidence or the law in this area to ascertain whether the patent is invalid for overclaiming.

19. The issuance of a patent upon the basis of an innocent misrepresentation of

fact in the Patent Office serves only to destroy the presumption of validity of the patent. Huston v. Buckeye Bait Corp., D.C.S.D.Ohio, W.D.1955, 145 F. Supp. 600; affirmed 6 Cir., 1956, 237 F.2d 920. Even a deliberate misrepresentation had only this effect prior to the Precision Instrument case. Floridin Co. v. Attapulgus Clay Co., D.C.Del.1940, 35 F.Supp. 810, 814; affirmed 3 Cir., 1942, 125 F.2d 669.

of the terminology critical to the discussion which follows is found at 169 F. Supp. 18, supra.

Defendants' argument runs thus: Neither Simmons' original application filed February 23, 1940 nor its two amendments filed on March 17, 1941 and May 24, 1941, respectively, were sufficient to cause the Patent Office to take favorable action by issuing the patent. The rejection which occurred on June 10, 1941, although based in part upon certain technical deficiencies, was fundamentally the result of the view of the Patent Office that Simmons' claimed invention was an obvious substitution of elements disclosed in the prior art and failed to reveal "the occurrence of new and unobvious results". Defendants point out that following this rejection, Simmons, on November 19, 1941, again amended his application to meet the technical objections of the Patent Office and then asked for a reconsideration of the basic objection of unpatentable substitution. Defendants say that at this point, Simmons, in order to revitalize his application by demonstrating that the bonding of the wire accomplished a new and unobvious result, made two deliberate misstatements to the Patent Office upon the basis of which the patent issued. The first was:

> " * * * a phenomenon is the fact that the filament may be repeatedly stressed beyond its elastic limit and still maintain its strain sensitivity factor".[20]

The parties are in disagreement as to the meaning of "strain sensitivity factor"; and defendants' argument hinges in part upon its resolution. According to defendants the statement that the bonded wire will maintain its "strain sensitivity factor" even though the wire is repeatedly stressed beyond its elastic limit, means that any type of wire used in the gage will provide a linear relationship between the change in strain and change in resistance. The word "factor", defendants argue, means a constant and not a variable numerical relationship. On the other hand, plaintiffs assert that Simmons never intended that "strain sensitivity factor" should be limited to a linear or constant numerical relationship, but that he used the term in a broader sense to embrace either a constant or a variable numerical relationship depending upon whether or not a wire capable of a linear response was used in the gage.

At the time when Simmons made the "strain sensitivity factor" statement which defendants condemn as false, Baldwin, through its house patent attorney, Hathaway, was in control of the prosecution of the Simmons application. It was also in control of a patent application for a strain gage which Dr. Ruge had filed five months prior to the Simmons application[21]. Baldwin was there-

20. Another similar statement referring to "strain sensitivity factor" also is included in the amendment.

21. In April 1938 Dr. Ruge, while a staff member engaged in research at M.I.T., devised a bonded strain gage. In either 1938 or 1939 Dr. Ruge entered into a partnership with Professor DeForest of M.I.T. to develop and manufacture strain measuring devices and to do consultation work. In 1939 Ruge-DeForest entered into an informal agreement with Baldwin under which Ruge-DeForest agreed to develop and manufacture devices for measuring strain and Baldwin agreed to serve as a market outlet and to assume full control of the prosecution of applications for patents to which Ruge-DeForest were entitled. This was formalized by a written contract between Ruge-DeForest and Baldwin on September 3, 1940. On September 16, 1939 Ruge, acting through Hathaway, filed an application for a patent on his bonded wire strain gage.

In September 1936 Simmons, an electrical engineering student at Cal. Tech. suggested the combination of the patent in suit, and it was tried and proved successful. Ruge and Baldwin learned of Simmons' work and Hathaway was sent to California to prepare Simmons' patent application. This was filed on February 23, 1940. By this time apparently Simmons and Baldwin had reached an understanding which eventuated in a written contract dated March 13, 1940. Under this contract Baldwin was licensed to make, use and sell apparatus embody-

fore in privity with both inventors at all times during the prosecution of their respective patent applications. This fact is of critical importance in determining the meaning to be accorded to "strain sensitivity factor" in the Simmons application.

The phrase "strain sensitivity factor" had its origin in the Ruge application filed September 16, 1939. There it is used to encompass strain-resistance relationships which were either linear or non-linear. After referring to wires which possess linear characteristics Dr. Ruge said:

> "In some filament materials, such as, for example, in certain nickel wires the strain sensitivity factor is not a constant but varies with the strain."

Even so, Dr. Ruge continued, wires having characteristics of non-linearity, if employed in gages constructed in accordance with his teaching,

> " * * * will reproduce results accurately and upon calibration may be used for quantitative strain measurement."

So at the outset the Patent Office was told in express terms, in an application filed on behalf of Ruge by Baldwin acting through Hathaway, that "strain sensitivity factor" was not used to connote linearity only.

The original Simmons application was filed on February 23, 1940. It was amended on March 17, 1941. Neither this amendment nor the original application mentioned "strain sensitivity factor". On May 19, 1941 Hathaway sent a supplemental amendment to Simmons for execution. In his covering letter Hathaway told Simmons that the purpose of the amendment was to present to the Patent Office the "phenomenon" that when a strain gage was made in accordance with the Simmons method, the wire could be repeatedly stressed beyond its elastic limit and still maintain "its predetermined factor of strain sensi-

tivity", and that Ruge had recognized this phenomenon in his application. Having this knowledge, Simmons on May 24, 1941 filed his supplemental amendment in which he pointed out the "phenomenon" that the bonded wire could be stretched beyond its elastic limit while retaining its "predetermined factor of strain sensitivity". Simmons said that this phenomenon was inherent in his structure "the same as it is in the structure of the copending application of Arthur G. Ruge, Serial No. 295,-207, filed September 16, 1939." This is the first reference in the Simmons file wrapper to "factor of strain sensitivity" or to "strain sensitivity factor". By Simmons' cross reference to the Ruge application, the Patent Office was told that Simmons was using "factor of strain sensitivity" to mean precisely what "strain sensitivity factor" meant in the Ruge application, i.e., wires with either linear or non-linear characteristics.

In spite of the fact that Hathaway from the time of the filing of the Ruge application in 1939 had used "strain sensitivity factor" to express broadly a strain-resistance relationship which was either linear or non-linear, and the circumstances that the Patent Office had been informed of this interpretation both by the Ruge application and by the Simmons amendment of May 24, 1941, defendants say that when "strain sensitivity factor" was used in the Simmons amendment of November 19, 1941, Simmons intended, and the Patent Office understood, that the expression should have the limited meaning of linearity only. Defendants have advanced no satisfactory reason to justify a conclusion so illogical. I therefore reject this aspect of defendants' argument.

A more difficult question arises as to the meaning which Simmons intended to convey to the Patent Office when he said in his amendment of November 19, 1941:

> "As a result of applicant's arrangement, he is able to stress his

ing the inventions covered by the Simmons application, and Baldwin was given

full control of the prosecution of the application.

24

specimen beyond its elastic limit and repeat the stress deformations while faithfully maintaining the linear qualities of the strain sensitivity factor."

Defendants assert that this is a representation that all types of wire when bonded have linear characteristics of strain sensitivity even though stressed beyond their elastic limit. This argument presupposes that in the context of the application "specimen" means wire. Plaintiffs deny this and say that "specimen" refers to the test body. The area of dispute is narrow and precise. If defendants are right the Patent Office was supplied with inaccurate information which Baldwin knew or at least should have known to be false. For in the Ruge application filed by Baldwin reference is made to the non-linear characteristics of "some filament materials" including nickel.

Defendants argue most persuasively that unless "specimen" means wire, the statement is meaningless [22]. On the other hand, plaintiffs point out that "specimen" is used to mean test body and not wire in the sentence immediately preceding that which defendants criticize. Moreover, plaintiffs say, the word "specimen" or "specimens" was used 87 times in the Simmons file wrapper and in no instance did the words refer to a strain sensitive wire. In view of the cogency of each of the opposing arguments I find myself in somewhat of a quandry to understand exactly what "specimen" was intended to mean when it was used in the sentence which defendants assert was false. However, as I have construed "strain sensitive factor", the use of this expression in the November 19, 1941 amendment told the Patent Office that wires with either linear or non-linear strain-resistance characteristics could be strained beyond their elastic limit without altering the predetermined strain-resistance relationship. In view of this representation, it is difficult to conclude that Simmons intended in the same amendment by his "specimen" reference to say that all wires have a linear strain-resistance relationship. Yet this is what I must conclude if I interpret "specimen" to mean wire. The irreconcilable inconsistency in the representations in the November 19, 1941 amendment which result from construing "specimen" as defendants urge, as well as the previously stated arguments advanced by plaintiffs to show that "specimen" was used to mean body under test, persuade me that "specimen" should not be construed as synonymous with wire. Hence the foundation for defendants' argument falls.

Defendants make the contention that experiments conducted by Dr. Ruge and his associate Dr. Meier at M.I.T. in the spring of 1938 which were recorded in a notebook kept by Meier disclose that the stressing of at least one type of wire (Elinvar) beyond its elastic limit will destroy its strain sensitivity factor. Without pausing to evaluate the significance of the Meier notebook and Dr. Ruge's testimony with respect thereto, it is sufficient to point out that the relationship between Dr. Ruge and Baldwin which was entered into in 1939 was not such as to make imputable to Baldwin the Meier notebook knowledge possessed by Ruge [23].

Furthermore, even if the statements in the November 19, 1941 amendment which have been dealt with meant to Simmons and the Patent Office what defendants say they must have meant, defendants still must prove that the statements were material in the sense that but for them the patent would not have issued. A false statement which has been recklessly made will not serve to destroy the presumption of the valid-

22. See cross-examination of Ruge at R-18: 2433–2445.

23. For discussion of the relationship which prevailed between Baldwin and Dr. Ruge, see footnote 21, 169 F.Supp. at page 22, supra. Defendants make no contention that Dr. Meier's information is imputable to plaintiffs, or that Dr. Ruge's knowledge is imputable to Simmons.

ity of a patent unless the statement was "essentially material" to its issuance. Corona Cord Tire Company v. Dovan Chemical Corp., 1928, 276 U.S. 358, 373–374, 48 S.Ct. 380, 72 L.Ed. 610. *A fortiori* such a statement, unless material, cannot prevent enforcement of the patent.

The argument which Simmons in the amendment of November 19, 1941 made against the Patent Office position that his invention was an obvious substitution of prior art disclosures, consumed more than two pages [24]. Spacewise, the statements which defendants say were misrepresentation comprised only an insignificant part of the argument. The argument in its entirety was summarized by Simmons at its conclusion by referring to the "many new and unobvious results" shown by his amendment. Among other contentions which Simmons advanced was the multitudinous practical uses which had been made of the Simmons gages during the pendency of the application. The record does not show which of the arguments caused the Patent Office to take favorable action on the application. It is to be doubted whether the "strain sensitivity factor" reference in the November 19, 1941 amendment was the inducing cause of the Patent Office granting the patent. After all, in his original application Simmons had stated that linearity of calibration was an objective of his patent, and under the "Remarks" which accompanied his amendment of May 24, 1941 he had referred to the "strain sensitivity factor" substantially as he had in his amendment of November 19, 1941. Yet, in spite of these statements the Patent Office on June 10, 1941 had rejected the application as then amended. Hence, the

materiality of the so-called misrepresentations contained in the November 19, 1941 amendment must rest at best upon a dubious and tenuous inference.

 The law is settled that the proof of fraud must be clear, unequivocal and convincing and that a mere preponderance of evidence which leaves the issue in doubt may not properly be a basis for a finding of fraud. United States v. American Bell Telephone Co., 1897, 167 U.S. 224, 241, 17 S.Ct. 809, 42 L.Ed. 144; Fidelity & Casualty Co. of New York v. Genova, 6 Cir., 1937, 90 F.2d 874. By this standard (or indeed by the ordinary preponderance of evidence test) it is not possible for me to conclude that a fraud was perpetrated upon the Patent Office by virtue of which the patent issued.

### (b) Patent Misuse

 1. *Requirements Licenses.* Defendants assert that Baldwin imposed a contractual obligation upon a number of its licensees which required them to purchase all or substantially all of their strain gages exclusively from Baldwin. This requirement is said to violate § 3 of the Clayton Act [25]. If this is true the patent may not be enforced. A patentee who attempts to expand the patent monopoly in derogation of the anti-trust laws is estopped to enforce it. Mercoid Corporation v. Minneapolis-Honeywell Regulator Co., 1944, 320 U.S. 680, 684, 64 S.Ct. 278, 88 L.Ed. 396.

The agreements containing the requirements provisions were entered into by Baldwin between 1944 and 1949 with a number of aircraft companies. Each of these agreements constitutes both a license and a sales contract, although it is designated a "license". The license

24. D–54, pp. 73–75.

25. Section 3 of the Clayton Act (15 U.S.C.A. § 14) reads:
"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, * * * whether patented or unpatented, for use, consumption, or resale within the United States * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, * * * of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

between Baldwin and North American Aviation Company is typical. By this license Baldwin granted to North American a non-exclusive right to manufacture for specified limited uses and disposition a wire-type strain gage embodying the invention of a number of patents, including the Simmons patent. The quantity which North American was authorized to manufacture was limited to 10% of its annual requirements; North American was required to buy the remainder of its requirements from Baldwin. North American was free to manufacture gages which were not subject to Baldwin's patents. The purchase requirement pertained to patented gages only. The license ran from year to year and was subject to annual termination by either party upon notice.

Analyzing the requirements provision in the terms of § 3 of the Clayton Act, it appears that the contracts are "for sale of goods", Radio Corporation of America v. Lord, 3 Cir., 1928, 28 F.2d 257, 259, certiorari denied 278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 560; that the obligation to buy exclusively from Baldwin is tantamount to an agreement "not (to) use or deal in the goods * * * of a competitor or competitors * * *" of Baldwin's, Standard Oil Company of California and Standard Stations v. United States, 1949, 337 U.S. 293, 297–298, 69 S.Ct. 1051, 1054, 93 L.Ed. 1371; and that the Clayton Act by its terms applies to both patented and unpatented articles.

It is to be noted that the licenses do not prevent the licensees from buying gages of any kind, in any quantities, and from whomsoever the licensees pleased, so long as the gages do not infringe Baldwin's patents. In effect, the agreements are undertakings not to infringe the Baldwin patents.

To contravene § 3 of the Clayton Act a requirements contract must provide a potential or actual clog on substantial competition. Standard Oil Company of California and Standard Stations v. United States, supra. But the competition which the Clayton Act is designed to encourage is legitimate competition. It has no interest in fostering illicit competition. Yet, defendants' argument presupposes that the contrary is true and that an infringer is the object of the same Congressional solicitude as an honest trader. Since the patent laws subject an infringer to an action for an injunction and damages, an agreement to refrain from infringement is beyond the reach of the Clayton Act.

International Business Machines Corporation v. United States, 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 does not point to a contrary conclusion. There, the Court held that § 3 of the Clayton Act had been violated by a lease of a patented tabulating machine which provided that the lease should terminate if cards not manufactured by the lessor were used in the leased machine. It was assumed by the Court that the licensor owned patents which gave it a monopoly to manufacture and sell the cards separately and in combination with tabulating machines.

International Business Machines involved the validity of a tying clause; the requirements provisions of the Baldwin licenses do not. What the tying clause cases condemn is the extension of the monopoly of one patented product to create a monopoly or restraint of competition with respect to a second product not countenanced by the patent applicable to the first product. Automatic Radio Mfg. Co. v. Hazeltine Research, 1950, 339 U.S. 827, 832, 70 S.Ct. 894, 94 L.Ed. 1312; Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277. Neither the *rationale* nor the doctrines involved in a tying clause case can be utilized to dispose of a case involving a requirements provision. Times-Picayune Publishing Co. v. United States, supra, 345 U.S. at page 614, 73 S.Ct. at page 883. This was implicitly recognized in Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 1938, 98 F.2d 999, 1010–1011, certiorari denied 1939, 305 U.S. 662, 59 S.Ct. 364, 83 L.Ed. 430 when the Court sustained a

requirements clause pertaining to the purchase of a patented article the terms of which were substantially indistinguishable from that in the Baldwin license. In the copyright field a result comparable to that in Steiner was arrived at in Cardinal Films, Inc., v. Republic Pictures Corporation, D.C.S.D. N.Y.1957, 148 F.Supp. 156.

Defendants argue that by the requirements provisions in its licenses Baldwin has protected itself from infringement without putting the validity of its patent in hazard as it inevitably would have done if it had sued the licensee or its vendor for infringement. This contention is based upon the following statement in the International Business Machines opinion, 298 U.S. at page 137, 56 S.Ct. at page 704:

"* * * The only purpose or effect of the tying clause, so far as it could be effectively applied to patented articles, is either to prevent the use, by a lessee, of the product of a competitor of the lessor, where the lessor's patent, *prima facie*, embraces that product, and thus avoid judicial review of the patent, or else to compel its examination in every suit brought to set aside the tying clause, although the suit could usually result in no binding adjudication as to the validity of the patent, since infringement would not be in issue. * * *"

Regardless of what was said in the International Business Machines case when a tying clause was involved, later decisions make it clear that when an agreement otherwise offensive to the anti-trust laws is sought to be sustained upon the ground that its terms are consistent with the monopoly conferred by a patent to which the agreement pertains, the validity of the patent can be assailed in connection with the assault upon the agreement. Sola Electric Co. v. Jefferson Electric Co., 1942, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; Mac-

Gregor v. Westinghouse Electric & Mfg. Co., 1947, 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380; Katzinger Co. v. Chicago Metallic Mfg. Co., 1947, 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374. Under these decisions, if Baldwin had sued under the requirements provision of its license to enjoin an aircraft company from purchasing an infringing gage, the aircraft company could have pleaded the invalidity of the Simmons patent and obtained an adjudication thereon.

At oral argument the contention was advanced for the first time that Baldwin had sold Simmons gages to "purchasers" and "licensees" other than the aircraft companies under terms which permitted their resale to the aircraft companies. These non-infringing gages, defendants assert, would have been potentially competitive with the gages which Baldwin was selling to the aircraft companies had not the competition been prevented by the requirements provisions of the aircraft company licenses [26].

The "licensees" of Baldwin to which defendants refer as potential competitors with Baldwin for the business of the aircraft companies, presumably included the individuals, educational institutions, and industrial organizations other than the aircraft companies, to which Baldwin had issued a wide variety of licenses. Some of these licenses, such as the so-called "experimental and research" licenses, confined the use of the gages to the licensees personally and expressly prohibited resale. These licensees could not possibly have been potential competitors of Baldwin for the business of the aircraft companies even if Baldwin's licenses with the latter had contained no requirements clauses. Other so-called "commercial licenses" granted by Baldwin contemplated the incorporation of the Simmons gage as an integral part of equipment of various kinds which the licensees were manufacturing and selling [27]. These licenses conferred no authority upon the licensees to sell strain

26. Transcript of argument, October 10, 1958, at page 157.

27. Examples of commercial licenses granted pursuant to these policies are as fol-

gages *per se*. These licensees were, however, free to sell equipment embodying the Simmons gage to the aircraft companies for the requirements provisions of the aircraft companies' licenses were not applicable to equipment embodying strain gages but applied only to strain gages *per se*. Competition between Baldwin and its "commercial licensees" for the aircraft company business was therefore in no way restrained by the requirements provisions in the aircraft companies' licenses.

The "purchasers" of Baldwin gages which defendants cite as potential competitors of Baldwin for the aircraft company business acquired their gages from Baldwin accompanied by a notice which stated that the gages could be used only in a temporarily expendable manner for testing purposes. Plaintiffs and defendants both agree that the notice did not prevent a resale of the gage to anyone—including the aircraft companies—provided the gages were used within the limitations of the notice [28]. Most of the aircraft company gage usage was within the area of use authorized by the notice. So that in theory at least purchasers under notice might have competed with Baldwin for the aircraft companies' strain gage trade had the aircraft companies not been burdened by the provision in their licenses requiring them to make all purchases of patented gages from Baldwin. The record, however, does not reveal the price which the pur-

chasers under notice or the aircraft companies paid Baldwin for their gages. Viewed realistically, unless the purchasers under notice paid Baldwin less than the aircraft companies paid it, they could not have been potentially competitive with Baldwin. Certainly a price differential in favor of notice purchasers as against the price paid by the aircraft companies cannot be assumed, especially in view of 15 U.S.C.A. § 13 which would have made such a price distinction *prima facie* illegal.

2. *Restrictions on Use of Gages after Sale.* Baldwin was an exclusive licensee of the Simmons patent with the right to sublicense. Nevertheless, Baldwin chose to exploit the patent primarily by manufacturing and selling the gages. The gages were subject to two general categories of use: first, in the field of structural testing or stress analysis when the gage was used in a temporary expendable manner; and second, as a part of some other machine or apparatus in which the gage performed a permanent operating, controlling or service function.

Baldwin sold the Simmons gages accompanied by notices and under "licenses". Vendees of gages sold with notices were prohibited from using the gages except in a temporary expendable way for testing or stress analysis purposes. By the notices Baldwin reserved to itself all fields in which the gages could be permanently used as an operating, controlling or service function as part of a ma-

lows: Byron Jackson Company (D–311)—restricted to the field of oil field tools and equipment; Waugh Equipment Company (D–277)—restricted to the field of weighing airplanes by permanently applying the gauge to the surface of a normally existing structural element; Brown & Sharpe Mfg. Co. (D–312)—restricted to certain machine tools and dimensional measuring tools; Cox and Stevens Aircraft Corporation (D–319)—restricted to compression cells for aircraft weighing and platform scales; Industrial Electronics (D–323)—restricted to certain torsional vibration pickups, linear vibration pickups, and fluid pressure sensitive units; Polyphase

Instrument Company (D–346)—restricted to the field of spark plugs for internal combustion engines; Instron Engineering Corporation (D–347)—restricted to certain enumerated equipment to be sold only for use in testing textiles and other non-metallic fibrous material; the Foxboro Company (D–351)—restricted to the field of fluid pressure measuring devices of the diaphragm type; Fredric Flader, Inc. (D–365)—restricted to the field of accelerometers and fluid pressure pickups of the sylphon bellows type.

28. Transcript of argument, October 10, 1958, pp. 157, 180.

chine, apparatus or device. Some of the reserved fields were exploited by Baldwin by the manufacture and sale of equipment and devices which utilized the Simmons gage to perform an operating, controlling or service function. Fields not so exploited by Baldwin were the subject of so-called "commercial licenses" which Baldwin granted to other manufacturing concerns. While these licenses were non-exclusive, Baldwin's policy was to issue only one of these licenses for each field of use. See footnote 27, 169 F.Supp. at page 27, supra. Under each license Baldwin sold gages to the licensee but with a provision that the gages could be resold only as an element in apparatus manufactured by the licensee. The result was that Baldwin was able to manufacture and sell devices embodying the Simmons gage as an operating, controlling or service element without competition from others, and its commercial licensees were able to sell equipment embodying the Simmons gage as a permanent element in fields which were non-competitive with each other.

Agreements among competitors to allocate or divide marketing territories for unpatented articles are unreasonable *per se* and void under the Sherman Act. Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. The arrangements between Baldwin and its vendees could not survive the Sherman Act if the gages had been unpatented. Defendants say that although the Simmons gages were patented, the monopoly of the patent was exhausted by the sale of the gages, and that thereafter they had the status of unpatented articles of commerce. The validity of this argument depends upon whether under the patent laws a patentee who sells a patented article may validly restrict the use which the vendee may make of it.

The Supreme Court has said on many occasions that the monopoly of a patentee remains so long as he retains ownership of the patented article, but that the monopoly ends with the sale of the article and that the patentee may not thereafter, by virtue of his patent, control the use of the article. The statement in United States v. Univis Lens Co., 1942, 316 U.S. 241, 250–252, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408 is typical:

> " * * * His monopoly remains so long as he retains the ownership of the patented article * * * and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article. Bloomer v. McQuewan, 14 How. 539, 549–550, 14 L.Ed. 532; Adams v. Burke, 17 Wall. 453, 21 L.Ed. 700; Hobbie v. Jennison, 149 U.S. 355, 13 S.Ct. 879, 37 L.Ed. 766. * * * "
>
> * * * * * *
>
> " * * * The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers. * * * "

Equally terse statements to the same effect are found in United States v. General Electric Company, 1926, 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362; United States v. Masonite Corporation, 1942, 316 U.S. 265, 277–278, 62 S.Ct. 1070, 86 L.Ed. 1461; Bauer & Cie v. O'Donnell, 1913, 229 U.S. 1, 17, 33 S.Ct. 616, 57 L.Ed. 1041; and Keeler v. Standard Folding-Bed Company, 1895, 157 U.S. 659, 666, 15 S.Ct. 738, 39 L.Ed. 848.

It is true that these statements were made either in cases such as Keeler v. Standard Folding-Bed Company, supra, which involved a sale without a restraint on use, or in cases such as Bauer & Cie v. O'Donnell, supra; United States v. General Electric Company, supra; United States v. Univis Lens Co., supra; and United States v. Masonite Corporation, supra, in which patentees attempted to fix the resale price of patented articles; and that cases in each of these groups may possibly be distinguished from that at bar wherein a limitation on use is sought to be imposed in connection with an initial sale by a patentee. Nevertheless, the consistency with which the Supreme Court has asserted for over half a

century that the patent laws afford no authority for a patentee to control the use to which a patented article may be put after the patentee has sold it, and the failure of the Supreme Court to qualify in any way the reach of this principle make me disinclined to write exceptions into the principle at odds with its inherent comprehensiveness.

■ So that what the Supreme Court has said on the subject ends the matter. The restrictions which Baldwin imposed upon its licensees and purchasers under notice find no support in the patent laws and constitute an effort by Baldwin to enlarge the patent monopoly beyond the point contemplated by the patent laws. The validity of the restraint on use to which Baldwin's vendees were subjected must be upheld, if at all, not as an incident of the patent grant, but as a matter of general contract law. So tested, the allocation of fields of use are illegal *per se* under the principle enunciated in Addyston Pipe & Steel Co. v. United States, supra, in construing the Sherman Act.

Furthermore, Baldwin's policy of limiting the use of its gages after their sale had a more basic vice. Baldwin realized from the beginning that profits on the sale of Simmons gages *per se* would be minimal and that if it was to secure a reasonable return it would have to be obtained from the sale, either by itself or by its licensees, of apparatus in which the Simmons gage was embodied as a permanent, operating, controlling, or service element. Accordingly Baldwin established a policy for the marketing of its gages which compelled anyone who desired to use a Simmons gage as an element in an apparatus of a type manufactured by Baldwin or by its licensees, to buy the apparatus from Baldwin or its licensees, regardless of whether similar apparatus could be obtained from other manufacturers. To illustrate, if anyone desired to use a Simmons gage as an element in a load cell (a device for weighing airplanes) he could do so only by purchasing both the load cell and the gage from Baldwin. Similarly, if anyone desired to use a Simmons gage as an element in a weight indicator, tong torque indicator, or drilling fluid pressure indicator for use in connection with oil field tools or equipment, he could do so only by purchasing both the indicator and the gage from Byron-Jackson, one of Baldwin's commercial licensees [29]. Had Baldwin not restricted the use which could be made of the gages which it sold, the buyer of the gages could have purchased load cells or indicators from any supplier of his choice and used the gages in connection with them.

When Baldwin himself was the seller, as in the case of the load cells, the competitive benefit which it received in the restraint on the use of its gages is obvious. But Baldwin obtained additional rewards from the enhanced competitive position which some of its licensees obtained by virtue of the use restriction. Thus, Baldwin not only made a profit when it sold strain gages to Byron-Jackson, but when Byron-Jackson sold weight indicators embodying the gage as an element, Byron-Jackson was required to pay Baldwin a royalty on all "attachments" and "measuring and/or recording instruments" which it sold for use with the indicators [30].

■ By thus conditioning the right to use Simmons gages as a permanent element solely with equipment purchased from Baldwin or its licensees, Baldwin has used the monopoly of the Simmons patent to further the sale of apparatus

29. See footnote 27, 169 F.Supp. at page 27, supra, for a list of other licensees which received similar competitive benefits from Baldwin's marketing policy.

30. The license between Byron-Jackson and Baldwin is typical of the commercial licenses listed in footnote 27, 169 F.Supp. at page 27. Under each the licensee was required to pay royalties to Baldwin based on the licensee's sales price of the machine embodying the Simmons gage or the instrumentation sold for use with the Simmons gage or upon the embodying machinery and the instrumentation.

with which the gages can be used. The Simmons patent was issued as a reward to Simmons for disclosing his strain gage discovery to the public. The monopoly which Simmons received from the Patent Office for this disclosure was the full recompense which the patent laws contemplated he should have. Baldwin has, however, utilized the patent so as to obtain a benefit beyond the purview of the patent statute. By its marketing policy of the gages Baldwin has been able to reduce or eliminate the competition which it and its licensees might otherwise have encountered in selling devices such as load cells and weight indicators not covered by the Simmons patent. Under the *rationale* of Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 and International Business Machines Corporation v. United States, supra, the manner in which Baldwin has "tied" the use of the Simmons gage to the use of apparatus not covered by the Simmons patent sold by it and by its licensees, constituted a misuse of the Simmons patent. That misuse bars the enforcement of the patent against the defendant in a court of equity regardless of whether the "tying" practices resulted in a violation of the anti-trust laws. Morton Salt Co. v. G. S. Suppiger Co., supra, 314 U.S. at page 494, 62 S.Ct. at page 406; see also Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 1947, 329 U.S. 637, 641, 67 S.Ct. 610, 91 L.Ed. 563.

▮ The record is not clear whether all of the products to which the Simmons gages were "tied" were covered by other Baldwin patents. This, however, is not material. The monopoly which the patent law grants with respect to an article covered by one patent may not be utilized to aid the patentee to exploit another article even though it is covered by another patent. Ethyl Gasoline Corporation v. United States, 1940, 309 U.S. 436, 459, 60 S.Ct. 618, 84 L.Ed. 852. Compare United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 157, 68 S.Ct. 915, 92 L.Ed. 1260; Automatic Radio Manufacturing Co., Inc., v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312.

35 U.S.C. § 271 is not inconsistent with the foregoing views.

The action must therefore be dismissed notwithstanding the fact that the Simmons patent is valid and infringed.

The statements herein are intended to serve as findings of fact and conclusions of law under Fed.Rules Civ.Proc. Rule 52, 28 U.S.C.A.

Let an order be submitted accordingly.

### On Petition for Reargument

A few supplemental observations appear warranted in view of the arguments made by plaintiffs in their petition for reargument.

▮ In contending that Baldwin has not misused the Simmons patent by tying the gage *per se* to the various types of strain sensitive apparatus which it and its licensees sell, plaintiffs assert that the apparatus is part of the patented combination and hence the entire structure—apparatus and gage—is subject to the monopoly of the patent. Plaintiffs point out that at p. 6 of 169 F.Supp., opinion filed on December 1, 1958 the test body is found to be an element of claim 5 of the patent. This finding is now retracted. A closer reading of claim 5 discloses that the test body is not an element of Simmons' invention. While claim 5 mentions the test body, the reference is simply to explain what strain the gage measures and to describe the bonding of the filament. This reference to the test body does not, without more, make it an element in the claim. Compare Williams Manufacturing Co. v. United Shoe Machinery Corp., 1942, 316 U.S. 364, 369, 62 S.Ct. 1179, 86 L.Ed. 1537.

The distinction between a patent which merely covers a gage *per se* and combination patents which cover a gage *per se* and the apparatus with which the gage is used, is disclosed by comparing the patent in suit with other patents of

Simmons' under which Baldwin grants licenses. The patent in suit states that it is "directed to my improved type of strain gage *per se*". Divided out of the application for this patent are patents covering the combination of a strain gage *per se* and specific types of apparatus with which the gage *per se* is used as a component. These divisional patents cover the combination of the gage *per se* when used in conjunction with a dynamometer (Patent 2,316,203), with an explosion pressure gage (Patent 2,327,935), and with a torque measuring apparatus (Patent 2,350,072). In each of the latter three patents the specific type of apparatus with which the gage *per se* is used is an element of the combination patent. In the patent in suit the "test body" with which the gage *per se* is used is not.

Plaintiffs contend that because of the limitations on use which are expressly imposed when Baldwin sells its gages, Baldwin's relationship with its purchasers under notice and its commercial licensees is legally no different than if the arrangement involved a license. Accordingly it is asserted that 35 U.S.C. § 271 (d) is a bar to the misuse defense.

Conceding *arguendo* that a sale with a restriction on use is indistinguishable from a license limiting use, still 35 U.S.C. § 271(d) will not sustain Baldwin's tying policy against the charge of misuse. Section 271(d) does not define the elements of misuse. It simply states what is *not* misuse. It says that it is not misuse for a patent owner, otherwise entitled to relief for infringement or contributory infringement, to derive revenue either from acts or from licensing others to perform acts which, if performed without the patentee's consent, would constitute contributory infringement. Plaintiffs argue that an unauthorized sale of apparatus to be used with the gage which Baldwin has sold under the notice restriction would constitute contributory infringement; hence, plaintiffs assert, by the terms of § 271(d) the tying of the apparatus to the gage cannot be a misuse of the patent.

The premise of this argument will not withstand analysis. Section 271(c) defines a contributory infringer. Under its definition one is a contributory infringer only if a combination of several factors exists. To be liable for contributory infringement under the statute (1) a person must sell a component of a patented combination, (2) the component must constitute a material part of the invention, (3) the seller must know that the component has been especially made or especially adapted for use in an infringement of the patent, and (4) the component must not be a staple article or commodity of commerce suitable for substantial non-infringing use. Assuming that in the case of an unauthorized sale of apparatus for use with the Simmons gage factors (1), (3) and (4) were proven, the seller still would not be a contributory infringer because the apparatus would not be "a material part of the invention". The divisional action in the Patent Office supports the view that the combination of the strain gage *per se* and specific types of strain sensitive apparatus constitute inventions distinct and independent from the invention of the strain gage *per se*. 35 U.S.C. § 121. Furthermore, in paragraph 54 of plaintiffs' proposed findings of fact it is stated that "the gage element manufactured and sold by Baldwin, and built by others under license, is the heart of the Simmons invention * * *". And at page 3 of plaintiffs' brief dated September 20, 1958 plaintiffs say that the "gage in all its forms, as sold, is * * * a special device constituting the heart of the patented combination". The evidence supports these statements, and forecloses a finding that the apparatus sold by Baldwin and by its licensees, even though they be deemed to be components of the patented combination, are material parts of the invention.

Since then an unauthorized sale of a strain sensitive apparatus for use with a strain gage *per se* would not constitute

contributory infringement, § 271(d) does not require a denial of the misuse defense.

In view of the finding that "the test body" in the Simmons patent is not a component of the patent, or, if it is, that it is not a material part of Simmons' invention, Hunt v. Armour & Co., D.C. N.D.Ill., 90 F.Supp. 767; affirmed, 7 Cir., 1950, 185 F.2d 722, relied upon by plaintiffs, is inapposite.

Plaintiffs argue that the record contains no evidence to support the statement which is found at page 31 of 169 F.Supp. in the December 1 opinion:

" * * * By its marketing policy of the gages Baldwin has been able to reduce or eliminate the competition which it and its licensees might otherwise have encountered in selling devices such as load cells and weight indicators not covered by the Simmons patent. * * * "

While there may be no direct evidence to support this statement, it is a fair inference to be drawn from all the evidence. Moreover, the record leaves no room to doubt that for years it has been Baldwin's policy to refuse to sell its gages *per se* to persons who might desire to use them with strain sensitive apparatus of a type manufactured by Baldwin or by its licensees unless the persons bought both the gages *per se* and the apparatus from Baldwin or its licensees. This policy was enforced regardless of whether the buyers were in a position to manufacture the apparatus themselves or to buy it from others. The enforcement of this policy constituted an illegal expansion of the monopoly conferred by the Simmons patent on the gage *per se* beyond that contemplated by the patent grant. This misuse is a bar to the enforcement of the patent against the defendants regardless of whether plaintiffs' activities constituted a violation of the anti-trust laws.

The foregoing shall constitute supplemental findings of fact and conclusions of law in accordance with Rule 52.

An order will be entered denying the petition of plaintiffs for a reargument.